# Richmond

## NATIONAL CAB COMPANY, INCORPORATED v.
## LILLIE S. THOMPSON.

April 22, 1968.

Record No. 6723.

Present, Eggleston, C.J., Buchanan, Snead, l'Anson, Gordon
and Harrison, JJ.

*Frank B. Miller, III; Edward A. Marks, Jr. (Sands, Anderson, Marks and Clarke,* on brief), for plaintiff in error.

*George F. Tidey (Bremner, Byrne, Baber & Somma,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

At issue is a judgment of $10,000 awarded Lillie S. Thompson, plaintiff, against National Cab Company, Incorporated, defendant, for an injury to her left thumb sustained in a taxicab accident.

On May 8, 1964, in Richmond, plaintiff, after alighting from defendant's taxi, and incident to the closing of the door, got her left thumb caught in the door of the cab and sustained the injury of which

she complains. She instituted action for damages in January, 1966, resulting in a jury trial in October, 1966. Defendant's motion to set aside the verdict as being excessive and to award it a new trial was overruled by the trial court and final judgment entered on January 6, 1967. Defendant was granted a writ of error.

The negligence of defendant has been resolved by the verdict of the jury in the court below, and our inquiry is limited to the question of damages.

Mrs. Thompson testified that after catching her left thumb in the door of the cab, she was taken immediately to her family physician, Dr. Henry Chesley Decker, who said "[t]here was a minor wound present". X-rays showed no bony injury such as a fracture or a dislocation, or any injury to the nail—only some soft tissue swelling. The wound was cleansed by an office nurse and dressed with anti-bacterial ointment. Sterile dressing was applied. Plaintiff received a booster of tetanustoxoid.

After being treated by her physician, Mrs. Thompson returned to her job at the C & P Telephone Company, where she had been employed for 5 years, and remained there until 7:30 that night.

Plaintiff returned to Dr. Decker the following day. He said the injury seemed to be improved, and after the dressing was removed, she was given a tube of antibacterial ointment and a box of large Band-Aids. She was instructed to soak the thumb daily in warm water, to apply antibacterial ointment and Band-Aids, and to return in a week for a progress report.

Dr. Decker saw the plaintiff on May 16th, at which time "[s]he seemed to be doing very nicely" and was advised "to continue with the same treatment". He saw her again on May 19th and she seemed to be doing very well and was advised to discontinue the Band-Aids and to exercise the thumb under warm water in an attempt to remove the stiffness of the distal joint. The doctor told plaintiff that it would not be necessary for her to return unless she had further difficulty, and that he did not think she had received a severe injury and did not anticipate any further problem or permanent injury.

Plaintiff was seen by her doctor on September 17, 1964, for another purpose and again on May 1, 1965, and October 22, 1966, when she made visits to him for evaluation purposes. No treatment was prescribed on these occasions.

On May 1, 1965, Dr. Decker's records show that plaintiff stated to him " . . . that the thumb was not as strong as it used to be prior to the accident; that she still had a numb sensation of the tip of the

thumb. And she complained of some stiffness of the distal joint". He said that on physical examination the appearance of the thumb was perfectly normal from simply looking at it; that there was no swelling or discoloration or any defect that you could note; and that in comparing the flexion movement of the distal joint with the good thumb, there seemed to be a slight degree of disability present.

At the trial Dr. Decker estimated plaintiff's disability " . . . as a fifteen percent disability of the entire thumb. . . . " He felt that in regard to her job at the telephone company, there "would be some disturbance in the use of the hand with this type of disability". He did not think that the numbness on the tip of the thumb would have too much effect on her activities, describing it as "just sort of an unpleasant sensation" which should not bother her too much.

Plaintiff was examined by Dr. Ernest L. Clements, Jr., an orthopedic surgeon, on September 29, 1966. His examination disclosed a rash, a reddish area, and a few bumps localized mainly to the side of one joint of the thumb. He found a very slight "flexion contracture", meaning the thumb has lost a little of its motion, which he measured at ten degrees. In testing her for pain sensation, he stated that she did not feel a pinprick as well on one side of her thumb as she did on the other; and that in testing her with cotton for touch, there was little difference between the two sides. He stated that from X-rays of both hands, he determined that the right thumb would come out a little bit farther than the other. He also found on testing for "finger pinch" that plaintiff had some weakness in the left thumb as compared with the right.

He expressed the opinion that the main difficulty experienced by plaintiff is that "she felt more clumsy with her hand" because of difficulty in pinching things. He " . . . interpreted her subjective loss of pain sensation to be due to injury to the digital nerve, that is a small nerve that runs down on each side of the fingers and on the thumb . . . [p]ossibly as a result of the time that it was caught. . . ."

With reference to the "rash", he felt that it was contact dermatitis from something plaintiff was getting on her hands, and that, by reason of her injury, perhaps she had a greater susceptibility to contact dermatitis in this area of the thumb. He estimated the percentage of loss by plaintiff of the use of her thumb to be 15%.

Plaintiff testified that for two weeks following the accident she could use her thumb very little, and she could not button her clothes or do any of the housework that required the use of her hand to hold

or grasp things. She stated that her thumb tires easily; that she still has a numbness and lack of feeling in a portion of the thumb; and that it is sensitive to cold. She also stated that if she uses that portion of the thumb which is not affected, rather than the portion which does not have proper feeling, the part used tires and aches more easily from overuse.

Since the accident, plaintiff has received a promotion and an increase in salary from the telephone company. In her present position she is one of eight girls who are seated around an eight-position rotary wheel that contains metal bound code books and is electronically operated. Plaintiff controls a series of three buttons located to her left, and they are operated by her left hand, thereby freeing the right hand to remove books from the wheel.

We observe here that the record in this case is virtually free from objections. The jury was fully and fairly instructed and had before it two issues only—negligence and damages. Both were resolved in favor of the plaintiff.

It was said by Mr. Justice Carrico in *Smithey v. Sinclair Refining Company*, 203 Va. 142, 145, 122 S. E. 2d 872, 875: "In this Commonwealth we have, by decisions so numerous and so familiar that they require no citation, sought to uphold the sanctity of the jury verdict. It is our duty to sustain a verdict that has been fairly rendered."

Defendant argues that it, a cab company, presented an "attractive target" to the jury, and that the verdict in this case is so manifestly excessive, for the injury sustained, as to be punitive.

A comment made by the trial judge after the verdict is also discussed by defendant. This remark by the judge was apparently prompted by the testimony or some occurrence during the trial.

On the question of negligence, plaintiff testified that as the door of the cab was being closed, and as she went to push it, the driver at the same time decided to close the door, " . . . [a]nd so he went to pull it, and when he pulled the door there was sort of a jerk, and it jerked my thumb into the door".

At the trial, the driver testified that before he had turned around plaintiff had shut the door of the cab and in doing so caught her thumb in the door. Immediately after the accident, defendant's personnel manager was called and made a written report of the accident. On the witness stand he testified that the driver of the cab then said:

" . . . Mrs. Thompson got out of car. He [the driver] reached

to close the door. At that time Mrs. Thompson reached and closed the door, also, and the door was closed on her thumb on her left hand. Mrs. Thompson made almost the same statement.

"Now that's—I don't remember her making it now at the present time, but that's the time then that I made the notation. This was made on May 8, 1964, around 10:30 in the morning on Friday."

Defendant also comments on the conversation that took place between the plaintiff and the driver of the cab en route to Dr. Decker's office, during which the driver complained that the occurrence of the accident would cause him to lose a safety driving bonus of fifty dollars. After the verdict was returned, the defendant moved to set it aside as being contrary to the law and evidence and as excessive. The trial court then made the following observation:

"Mr. Marks, if you tell me you want to argue the point of excessiveness, I will hear it; as far as whether or not it is supported by the evidence, I consider it the only possible verdict on the evidence before me. As a matter of fact, I am not sure but what this is a case for the Commonwealth's Attorney's Office, but be that as it may, if you request me, I will continue the motion to permit you to argue the point of excessiveness."

While there is obviously some discrepancy between the testimony of the driver at the trial, and the version of the accident that he gave to his immediate superior on the day it occurred, it was not such a glaring variance as should have prejudiced the jury. The comment of the driver on his loss of a bonus was made at an inopportune time, but we question whether it alone showed such a crass lack of concern for plaintiff's welfare as should have influenced the jury.

However, it is manifest that there was something in the trial—the manner, demeanor, attitude or testimony of the driver—to have prompted the remark of the trial judge, a remark which plainly indicates that from what he had observed and heard during the trial he thought some investigation and prosecution by the Attorney for the Commonwealth might be indicated.

Defendant says, and not without some merit, that if there were something about the driver, or his testimony or the incidents of the trial, as to have provoked this remark from the judge, then it is most likely that the same happenings undoubtedly influenced the jury, and motivated it in rendering the verdict it did.

Few cases are tried where there are not conflicting and inconsistent

statements made by witnesses. In essence, the role of the jury is to resolve these conflicts and to ferret out the truth from conflicting testimony, whether given by the same witness or by witnesses on opposite sides. In making a judgment, it is proper that a jury consider the manner, demeanor and attitude of the witnesses, their interest, bias, or prejudice, and determine the credibility of their testimony. In the instant case, these were proper considerations for the jury in weighing the testimony of the plaintiff and of the driver on the issue of negligence. However, the demeanor of the driver of the cab, his candor, or lack of candor, his sensitivity under the circumstances, or lack of it, should not have influenced the jury in arriving at the *amount of damages* to which plaintiff was entitled.

We deem it appropriate to say here that there is nothing in the record to show that these factors did influence the jury, other than the remark of the trial judge, and inferences to be drawn therefrom, and the size of the verdict.

Defendant stresses the small amount of plaintiff's medical bill, and the fact that plaintiff was able to return to work immediately after the accident, and lost no time from work thereafter. The evidence is that the total medical expenses incurred by plaintiff amounted to $62, which included $25 for X-rays. The plaintiff did return to work after the injury and lost no time from her employment by reason of the accident. These are factors properly to be considered in determining the seriousness and permanency of the injury and the damages sustained.

Defendant also points out that there were no objective findings of any injury, the X-rays having shown no fracture or broken bones, or injury to the nail, or anything other than a slight swelling of the injured thumb.

Plaintiff argues that the type of injury she received will necessarily hinder her in the performance of the duties of her job. This too is a proper element for the jury to have considered. However, the injury does not appear to have had any material effect on her earning capacity, for she accepted her present position after the thumb injury, and apparently is performing her duties in a satisfactory manner.

Having viewed the evidence in the light most favorable to plaintiff, as we must, we still are confronted with a case involving an injury to the tip of a thumb—an injury that resulted in no impairment of her capacity to earn, in no loss of time from work, and in only a small cash outlay for medical expenses; an injury which is not disabling in any way and which resulted in a disability to a thumb, estimated to

be 15%; and with a permanency described as a minimal loss of flexion in the thumb, some numbness in its tip, some stiffness in one joint and some discomfort when exposed to cold. The nail of the thumb was not lost or damaged and there was no fracture or injury to the bone. The thumb looks normal, hence no aesthetic damage. The evidence regarding the "rash", as it relates to the injury, is too vague and uncertain to be considered as a serious element of damages in this case.

The principles of law which control our decision here were clearly enunciated in *Smithey* v. *Sinclair Refining Company, supra,* where this court further said:

"But this is not to say that the verdict of a jury is not subject to the control of the courts. A healthy administration of justice requires that, in a proper case, the courts must take action to correct what plainly appears to be an unfair verdict. This authority is an ancient and accepted part of the common law. . . .

"In a case where the verdict of a jury is attacked on the ground that it is excessive, the rules controlling the actions of the court in relation thereto are clear and well defined. If the verdict merely appears to be large and more than the trial judge would have awarded had he been a member of the jury, it ought not to be disturbed, for to do so the judge must then do what he may not legally do, that is, substitute his judgment for that of the jury. . . . [Citing authorities]

"But if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge, acting within his legal authority, to correct the injustice. . . . [Citing authorities]

\* \* \*

"In other words, if the verdict is fairly reached, is sustained by the evidence, and there is no standard to measure the damages, it is not then excessive and cannot be disturbed. On the other hand, if the verdict is plainly excessive it necessarily follows that it is not supported by the evidence, and it may be corrected, in the exercise of sound judicial discretion, by putting the prevailing party on

terms to accept a reduced amount or else submit to a new trial. . . . [Citing authorities]

"Each case must be judged on its own merits, according to its own peculiar facts and circumstances. What is fair in one case might be entirely inadequate or grossly excessive in another. If the size of the verdict bears no reasonable relation to the damages dis-closed by the evidence, it is manifestly unfair. If a standard to measure the damages is lacking, we must depend upon the trial judge to use his sense of justice and fairness, sometimes aided by the 'average verdict rule,' to correct the unfairness. . . . [Citing authority]" 203 Va. 142, 145, 146, 147, 122 S. E. 2d 872, 875, 876.

In addition to the cases cited in *Smithey*, see to the same effect: *Edmiston* v. *Kupsenel*, 205 Va. 198, 135 S. E. 2d 777; *Davenport* v. *Aldrich*, 207 Va. 271, 148 S. E. 2d 768; *Miller* v. *Motor Company*, 207 Va. 900, 153 S. E. 2d 266; and *John Doe* v. *Brown*, 203 Va. 508, 125 S. E. 2d 159.

Plaintiff has received an injury which can be described as "a mashed thumb", a common mishap from which few people escape during the course of a lifetime. This is not to minimize the injury. The reason that injuries to thumbs and fingers are so common is because of the constant use and importance of these members of a person's body. Here plaintiff has sustained an injury due to the negligence of de-fendant. She is entitled to recover damages and in an amount suffi-cient to compensate her adequately for the injury and any loss she suffered.

However, an exhaustive research of the authorities has disclosed no verdict where the injury was solely to the joint, or to the tip, of a thumb, which even approaches in amount the recovery in this case. We do find cases in which the recovery approximates the verdict here where a party received injuries in addition to an injury to a thumb or finger, and where there was loss of time from work and larger medical bills.

The *Smithey* case bears the most striking analogy to the instant case. There the plaintiff sustained a back injury in an automobile accident. He received emergency treatment in a hospital and was thereafter treated by his physician. X-rays were negative as to broken bones. He did receive a crushing injury to his chest, multiple contu-sions and lacerations of the left arm and right knee and a sprain and strain of the thoracic and lumbosacral spine. The only treatment given was strapping and medication to relieve pain, discomfort and

spasms of the muscles. He too was seen by his physician four times, exclusive of visits for trial purposes. His total medical expenses amounted to $56, and he lost seven days from work. The doctor found some slight limitation of back motion but did not think it would be permanent. At the time of trial, he was still complaining that his back hurt. His capacity to earn was not impaired and his injury was not considered disabling. The jury returned a verdict of $15,000, which the trial court found to be excessive and reduced it to $5,000. This court approved the action of the trial judge in ordering a remittitur of $10,000.

We are not unmindful of the weight which attaches to a verdict of a jury approved by the trial judge, but here we find the conclusion inevitable that the award of $10,000 bears no reasonable relation to the damages sustained by Mrs. Thompson, and therefore is not supported by, and is contrary to, the evidence. Although the record contains no evidence that the jury was actuated by passion, corruption or prejudice, the verdict is so excessive as to shock the conscience of the court. It creates the impression that the jury misconceived or misunderstood the facts or the law, and is not the product of a fair and impartial decision.

Accordingly, we conclude that this was a proper case for the trial court to have exercised the power vested in it by Code § 8-350 and put the plaintiff on terms to accept a lesser sum, or face a new trial on the issue of damages. In the absence of such action, and being of opinion that the verdict is excessive, we reverse the judgment of the trial court and remand this cause for a new trial limited to the question of damages only.

*Reversed and remanded.*