**Kerri Lynn ELLIOTT, by her father and next friend, Thomas Elliott, Jr., et al., Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. No. 10–88.**

United States District Court,
D. Maine, S. D.

Aug. 4, 1971.

Merle C. Rideout, Jr., Theodore Barris, Portland, Me., for plaintiffs.

Peter Mills, U. S. Atty., Portland, Me., Charles Kruse, Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, to recover damages for personal injuries sustained by the plaintiff Kerri Lynn Elliott as the result of the negligent care, diagnosis and treatment of Kerri Lynn, then an 18 months old baby girl, by United States Navy medical personnel at the U. S. Naval Dispensary at Norfolk, Virginia and the Portsmouth Naval Hospital at Portsmouth, Virginia, during the period June 27 to July 20, 1966. The case has been tried to the Court, without jury. The United States has conceded liability for any damages caused by such medical treatment, and the trial, which was held on February 24–26, 1971, was restricted to the damage issue.

At trial plaintiffs offered the testimony of Kerri Lynn's parents, grandmother, aunt and kindergarten teachers, together with the testimony and reports of a number of doctors and other professional persons who had either treated or examined Kerri Lynn. The latter included her pediatrician, Dr. Martin A. Barron of Portland; a psychologist, Dr. John S. Bishop of Portland; a neurologist, Dr. Cornelius A. Toner, formerly of Portland; and a psychiatrist, Dr. Peter W. Bowman, Superintendent of the Pineland Hospital and Training Center, Pownal, who had examined Kerri Lynn in November 1970 and January 1971. Defendant's evidence consisted of the

testimony and reports of a medical team from the Boston Children's Hospital Medical Center Development Evaluation Clinic, which had examined and evaluated Kerri Lynn's condition in July 1970. Included in the team were the Director of the Clinic, Dr. Allen C. Crocker, a pediatrician; the senior psychologist at the Clinic, Dr. Richard Schnell; and the chief nurse, Miss Marie M. Cullinand.

## Undisputed Facts

The undisputed evidence can be briefly summarized. On June 27, 1966, Kerri Lynn was a healthy, happy, normal baby, who had started walking and talking. On that date she became acutely ill with a high fever. She was taken to the Norfolk Naval Dispensary, where the examining doctor said she had an intestinal virus and prescribed some medication. On the following day, Kerri Lynn was still running a high fever and was taken back to the Dispensary, where the doctor said she had a kidney infection and sent her home with more medication. That evening she had a temperature of around 105–106°. She was taken back to the Dispensary and early in the morning of June 29 was admitted to the Portsmouth Naval Hospital. From 2:30 p. m. until midnight of June 29, she was convulsing and her stomach was bloated with substances which were eventually pumped out of her. Her convulsions were stopped by the use of general anesthesia. She was critically ill for several days thereafter and remained in the hospital until July 20. Her final diagnosis was a cellulitis with high fever. Upon her return from the hospital, she had regressed in her ability to walk and talk, was pale and listless, and had a poor appetite.

The consequences of her hospitalization were:

(1) She developed a seizure disorder and has had numerous convulsive episodes since July 1966. For control of these seizures, she is presently taking 50 milligrams of dilantin three times a day; 32 milligrams of mebaral twice a day; and 5 milligrams of dexedrine twice a day.

(2) She developed behavioral problems, manifested mainly by hyperactivity and an extremely short attention span. She is easily frustrated, becomes angry quickly, is hostile and uncooperative, and as a result is rejected by her peers and a disciplinary problem for her parents and teachers.

(3) She is not mentally retarded, but she has a learning difficulty and in the opinion of her kindergarten teachers will be unable, because of her emotional problems, to cope with work in the first grade of school.

Kerri Lynn was born in January 1965 and is presently six and one-half years old. She attended an eight-week "headstart" program in the summer of 1970, entered kindergarten in September 1970, and should enter the first grade this fall. Kerri Lynn's mother, plaintiff Keryl Lee Elliott, is a 29 year old housewife. Kerri Lynn's father, plaintiff Thomas Elliott, Jr., has 12 years service in the United States Navy. At the time of trial, he was an aviation mechanic, Grade E–4, stationed at the Brunswick Naval Air Station, Brunswick, Maine. He is presently in Vietnam. Barring some unforeseen contingency, he intends to, and undoubtedly will, remain in the Navy until August 1979, when he will have completed 20 years service and plans to retire on a pension. Most of Kerri Lynn's medical expenses to date and in the future have been and will be paid by the United States under the Uniformed Services Health Benefit Program for military personnel and their dependents ("CHAMPUS").

## Contentions

Plaintiffs contend that Kerri Lynn's convulsive disorders and behavioral difficulties are caused by organic brain damage and, as such, are permanent conditions as a result of which she will never be normal and will require special care and treatment for the remainder of her life. With respect to the convulsive

disorders, defendant contends that the evidence establishes that: (1) at worst, Kerri Lynn will be able to control the problem with drug therapy, living a relatively normal life, excluded from only the most extreme activities and suffering no loss of wages or other economic loss; and (2) based upon medical probability, the child can be withdrawn from drug maintenance within the next few years and thereafter lead a normal life with no limitations or adverse effects. With respect to Kerri Lynn's behavioral problems, defendant contends that their basis is emotional rather than organic and, as such, they are treatable and curable, so that after several years of therapy, the child can lead a normal life.

### Applicable Law

■ The parties agree that the law of Virginia, the place where the act in question occurred, is the law applicable in this case. 28 U.S.C. § 1346(b). Hatahley v. United States, 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); Roman v. Velarde, 428 F.2d 129, 132 n. 5 (1st Cir. 1970); Haginikitos v. United States, 412 F.2d 219, 220 (3rd Cir. 1969); Gowdy v. United States, 412 F.2d 525, 527 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969). The parties further agree that the law of Virginia, as of most other jurisdictions, provides that a tortfeasor is liable in damages for all injuries that naturally and necessarily follow from the tortious act. Watford v. Morse, 202 Va. 605, 608, 118 S. E.2d 681, 683 (1961); Safety Motor Transit Corp. v. Cunningham, 161 Va. 356, 366, 171 S.E. 432, 435 (1933); Virginia Ry. and Power Co. v. Hubbard, 120 Va. 664, 668–669, 91 S.E. 618, 619 (1917); cf. Raven Red Ash Coal Co. v. Herron, 114 Va. 103, 75 S.E. 752, 756

(1912). The Virginia law also clearly establishes that the plaintiff has the burden to prove by a preponderance of the evidence the injuries sustained as a result of the tortious act. Diggs v. Lail, 201 Va. 871, 876, 114 S.E.2d 743, 747 (1960); Smith v. Wright, 207 Va. 482, 151 S.E.2d 359, 362 (1966). In Virginia, as elsewhere, damage awards cannot be based upon surmise, speculation or conjecture, but must be based upon reasonable probability. Smith v. Wright, supra; Hailes v. Gonzales, 207 Va. 612, 614, 151 S.E.2d 388, 390 (1966); Barnes v. Graham Virginia Quarries, Inc., 204 Va. 414, 419, 132 S.E.2d 395, 397–398 (1963); cf. Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836, 849 (E.D.Va. 1968). "Proof with mathematical precision is not required, but there must be at least sufficient evidence to permit an intelligent and probable estimate of the amount of damage." Hailes v. Gonzales, supra.

### The Seizure Disorder

Upon analysis, it is apparent that there are two basic elements to plaintiffs' damage claims: Kerri Lynn's convulsive seizures and her behavioral problems. Turning first to the matter of her convulsive seizures, there is no doubt that the child had violent convulsions while hospitalized in June-July 1966. It is also undisputed that since 1966, the child has had several convulsive episodes, which have been variously described as "petit mal," "grand mal" or "acanetic" seizures.[1] Because of this history of seizures, the child has been receiving anti-convulsive medication and is currently taking dilantin, mebaral and dexedrine. All the doctors agree, however, that Kerri Lynn's seizures can be controlled by medication. The doctors further agree that although the future

---

[1]. Mrs. Elliott testified that her child had an unknown number of what she called "petit mal" seizures in late 1966 and early 1967; has had four "grand mal" seizures, the first of which was in November 1967; and has had two "petit mal" seizures since November 1967, these being in August and September 1970. In December 1967 Kerri Lynn's discharge diagnosis at the Chelsea Naval Hospital was "grand mal epilepsy." Dr. Crocker's diagnosis was "convulsive disorder from acanetic seizures."

cannot be predicted with certainty, it is as likely as not that she can be withdrawn from medication within the next few years and remain seizure-free. In this respect, Dr. Crocker testified: "It would seem most likely on the basis of experience over the last year or two of her's that eventual lifting of medication control would be possible. * * * [I]n childhood seizures, in the majority, time is an asset rather than a liability in terms of the magnitude of the seizure problem. The statement is often made that nearly half of the children who in earlier mental childhood require seizure control medication will eventually be able to abandon that. * * * It is likely that her anti-convulsive medication needs will diminish rather than intensify, and in many individuals, they diminish to the point of total freedom from the use of drugs. * * * Certainly when as much as a year or so goes by with no seizures recorded, the time is fully at hand to begin to try lightening the anti-convulsive program." Kerri Lynn's pediatrician, Dr. Barron, agreed with Dr. Crocker that "if you took the child off, say, after she hadn't had a seizure for a couple of years, you probably wouldn't get any trouble * * *."

On this record, the Court can only conclude that plaintiffs have not proved by a preponderance of the evidence that Kerri Lynn cannot be withdrawn from medication within the next several years and remain seizure-free thereafter. Nor have they established that even if her medication cannot be withdrawn, her seizures cannot be controlled by anticonvulsive medication so that she can lead a relatively normal life.

### The Behavioral Problem

The second basic element to plaintiffs' damage claims concerns Kerri Lynn's behavioral problem, which has been manifested by hyperactivity, an extremely short attention span, frustration, frequent anger and lack of cooperation. In the view of this Court, the record does not support, as plaintiffs urge, a finding that this problem is either organic in nature or necessarily a permanent condition.

There is no dispute as to Kerri Lynn's present behavior, her results on tests and examinations, and what she can and cannot do. No one contends that she is retarded, and the psychologists agree that her intelligence is within the normal range. Indeed, a kindergarten teacher described her as "very quick and she seems to have the native ability to do well." Neither of the doctors who performed the neurological examinations of the child reported any abnormal findings, and both regarded her as having no significant neurologic functional impairment. All agree, however, that her behavior is not normal. Her mother describes her as "easily frustrated," "happy one minute and the next minute she is screaming in a piercing screaming voice and crying," "constantly on the go," "agitating," "very active," "doesn't feel loved," "comes home from school crying every day," "says nobody likes her," "cries an awful lot," "very unhappy," and having "frequent" temper tantrums. The doctors agree upon her hyperactivity, short attention span, distractibility, inattention, and her demanding and disruptive nature.

The behavior described above is not disputed by defendant. The dispute is as to what is the basis for the behavior and what can be done about it. Plaintiffs contend that such conduct is the result of organic brain damage. But both plaintiffs' and defendant's doctors agree that Kerri Lynn's behavior, while consistent with organic brain damage, is equally consistent with an emotional basis, and can result from either organic or emotional causes.[2] The doctors also agree that the fact Kerri Lynn has had

2. Indeed, Dr. Bowman, plaintiffs' psychiatrist, in his report, expressed the view that whether Kerri Lynn's behavioral problems are directly connected with organic brain damage or are primarily explainable on the basis of a psychological disturbance, "is of secondary importance when discussing the girl's current needs."

seizures does not provide any basis for saying that her hyperactivity and attention span difficulties are organically caused. As Dr. Toner, plaintiffs' neurologist, stated, "there's no cause and effect there."

Both Dr. Toner and Dr. Bishop, plaintiffs' psychologist, based their opinions that Kerri Lynn's behavioral problem was caused by organic brain damage upon a view that the child was "organically driven." In Dr. Toner's words, the child "can't stop," "just doesn't sit for a second," and "her attention span is [as] close to zero as we can possibly come." The record, however, does not support this description of her behavior. Her teachers stated that when she chooses to, she can join in play with other children and, when supervised, she does "everything the way she's supposed to." Both Dr. Bishop and Dr. Schnell, defendant's psychologist, found her able to perform the necessary testing, which required concentration and an ability to continue a task for an hour and a half. Dr. Schnell noted that she would become angry when confronted with things she didn't want to do, "but if you could find an activity which she enjoyed, she would be able to participate quite actively and had [sic] good attention span, and wasn't distractible, and would stay with it, and her activity level was perfectly appropriate." Dr. Bishop also stated that she would remain at the testing table, "and as long as she was under my direct supervision, she would comply with virtually any test demand or request that I made." When Dr. Bishop visited Kerri Lynn in her home, he noted that "in this environment she was usually reasonably calm and subdued with only a minimal amount of hyperactivity in evidence." The doctors agree that the fact the child can choose to participate in activities and cooperate in carrying them on without serious attention span or distractibility problems is inconsistent with the theory that she is "organically driven." As both Dr. Toner and Dr. Bishop acknowledged, if the cause of her behavioral problems were organic, it would be "more likely than not" that she would not have conscious control over her behavior, and the fact that she does have such control over a given activity and is able to choose whether or not to participate is more consistent with emotional than organic causation.[3]

The second basis of Dr. Bishop's opinion was the results of his psychological testing. Dr. Bishop admitted, however, that the results of all the tests fall within the normal range for a child of Kerri Lynn's age and stated in his report that errors made "cannot at her age be considered as definite signs of brain injury." He also conceded that the results noted by him were merely "suggestive but are by no means definitive indications of the possibility of brain damage in a youngster." Dr. Schnell noted that he and Dr. Bishop had obtained basically the same test results. In his opinion, the results of the tests he administered were strong evidence, based upon proba-

3. As stated by Dr. Schnell,

Again, some of the kinds of things that have been said before about organic impaired children, is that very often they are very active children, they are distractible, they have trouble staying with tasks, their attention span is short, but it is not a selective kind of thing, as it is in her case—that is, they are overly active, and overactive in just about all situations, it's not selective—they can't sit for a long time and do something of interest to them. For example, the distractibility is not a selective thing, they are distractible through many activities. She [Kerri Lynn] was only distractible in some activities especially those activities which seemed to touch on things which she was concerned about, and other things that weren't directly involved—say with formal testing she wasn't distractible. So, this is the kind of thing that we use in trying to determine whether or not a child's behavior was predominantly influenced by, say, organic factors, dysfunction of the central nervous system, whether or not the child seemed to have control over these things. In my opinion, she seemed to have very good control over these kinds of things depending on what the situation was.

bility, of the absence of an organic basis for Kerri Lynn's behavior.

From the foregoing summary of the expert testimony adduced by plaintiffs, it is apparent that the record cannot support a finding that Kerri Lynn's behavioral problems are the product of organic brain damage, and are therefore necessarily permanent. To the contrary, the evidence demonstrates that the more likely basis of her behavior is emotional, and, at least to some extent, treatable and curable.

At the request of both counsel, the trial of this case was deferred until Kerri Lynn could be evaluated at the Boston Children's Hospital Medical Center Developmental Evaluation Clinic. The Clinic evaluated Kerri Lynn over a three-day period in July 1970. The combined judgment of the evaluation team was that her behavioral problem was emotional rather than organic and, as such, can be treated and cured, so that, with appropriate supportive therapy for her *and her parents*, she should be able to lead a relatively normal life. The most outstanding feature of Kerri Lynn's behavior, as observed by the Clinic, was her marked anxiety and its associated hyperactivity. It was the conclusion of the Clinic that Kerri Lynn's emotional problems have developed primarily from her reaction to her parents' reaction to the child's illness: that because her parents have viewed her as a "damaged child" and have dragged her from one doctor to another, Kerri Lynn has adopted that impression of herself and regards herself as a defective child. The considered view of the Clinic staff is summarized in the following passage from its report:

> There would appear to be ample evidence to interpret Kerri Lynne's behavior as anxiety-ridden, and the results of this evaluation suggest that she is an intellectually normal girl, with minimal neurological findings and a seizure disorder suggestive of

past neurological insult. The prognosis for a normal life is not considered to be compromised by these findings, and there is no indication that special schooling will be necessitated by organic handicap. However, Kerri Lynne appears to have joined her parents in their perception of her as damaged. She is aware of a defective older brother,[4] whom she views as exiled, and she has cause to fear a similar fate for herself. The repeated examinations and rather relentless search for deficit in this little girl have very probably contributed to an emotional problem of significant and apparently increasing intensity. In the view of the staff of this Clinic, the deficiencies in her relationship to her parents, her repeated identification as a defective child, and the special anxieties inherent in her family situation at present, post the most serious threat to a good prognosis for the child's well-being.

As the Clinic Director, Dr. Crocker, testified, Kerri Lynn's " \* \* \* behavioral abnormality and her personal concerns and anxiety would appear to have the qualities of psychologic influence which is not that of the so-called organic brain syndrome, or whatever, in any important extent." For the future, the Clinic recommended that the child's medical management should be coordinated by a single individual or group; that further anxiety-provoking special examinations should be avoided; that her parents should seek help around the issue of the management of Kerri Lynn and the significance of her illness; and that the child should be given the opportunity, together with normal schooling, *to obtain specialized help for her emotional difficulties.*

It must be recognized that the difference of opinion between plaintiffs' and defendant's doctors in this case is basically a difference in interpretation, evaluation and diagnosis. Kerri Lynn's be-

---

4. Kerri Lynn's half-brother was found in 1964, at the age of four, to have PKU (phenylketonuria). He is retarded and attends the Pride Training School in South Portland. Kerri Lynn does not have PKU.

havior as described by the Clinic personnel is generally similar to that described by plaintiffs' witnesses. The Clinic psychologist, Dr. Schnell, and plaintiffs' psychologist, Dr. Bishop, obtained basically the same psychological test results, which confirmed the diagnosis of an emotional rather than an organic problem. Likewise, the Clinic neurologist and plaintiffs' neurologist, Dr. Toner, each found upon physical examination that Kerri Lynn had no basic neurological abnormality. It is not disputed that the Clinic is highly regarded nationally, is organized specifically for the purpose of evaluating children and providing appropriate treatment or therapy, and is staffed with outstanding specialists representing many disciplines. The total judgment of these specialists was that Kerri Lynn's problem was emotional rather than organic. That judgment is supported by the various descriptions of her behavior, the psychological test results and the neurological examinations testified to by both plaintiffs' and defendant's expert witnesses. It is accepted by the Court.

### Damages

Any award of damages in this case must take into account the fact that, so far as the record discloses, all of Kerri Lynn's medical expenses to date have been paid by the United States, and most of her medical expenses in the foreseeable future will be similarly paid. It must also be recognized that no precise determination of damages can be made because it is impossible to predict the future of Kerri Lynn, at her age. All the doctors agree that her prognosis is uncertain, and many things can happen in the next few years.

The difficulty in assessing damages in this case is further aggravated by the conflicting views of plaintiffs' and defendant's expert witnesses as to the appropriate type of schooling, treatment and therapy for her. On the one hand,

her kindergarten teachers state positively that because of her emotional difficulties, she is not able to cope with first grade work and would be completely lost in a regular first grade class. Both recommend special schooling. Plaintiffs' psychiatrist, Dr. Bowman, is also strongly of the view that Kerri Lynn needs more individual attention than public schools offer and that she must have special schooling, either in a daycare or residential setting, for an indeterminate number of years. He questions that the child can adjust to so-called "free schools," which would permit her to live at home. If an institutional setting is necessary, he estimates the minimum cost would be approximately $8,500 per year. On the other hand, the Boston Clinic team is equally emphatic that placing Kerri Lynn in a private school situation will only serve to confirm her fear that she is a damaged child and will probably make her emotional status much worse. The Clinic's view is that she should be treated as normally as possible; that she should continue to live at home; and that her schooling ought to be in a regular classroom context, supplemented by supportive psychotherapy for her and her parents. Dr. Schnell estimates that the necessary treatment will require from one to three visits per week for a period of one or two to several years at a cost of between $15.00 and $30–$40 per hour. All the doctors agree that Kerri Lynn's future will depend upon the treatment she is accorded over the next few years and that it is impossible to predict what her adjustment problems may be as an adult.

■ Despite the uncertainties in forecasting Kerri Lynn's future, this Court must make a single lump-sum award. Frankel v. United States, 321 F.Supp. 1331, 1340–1341 (E.D.Pa.1970); see United States v. Bauman, 56 F.Supp. 109, 116–117 (D.Or.1943); McCormick, The Law of Damages § 13 (1935).[5] Under

5. The rule which requires that all damages, future as well as past, must be taken into account and awarded in a

single lump sum judgment at the time of trial has been criticized, particularly in its application to cases such as the

Virginia law, as elsewhere, the amount of the award must be such as will fairly and adequately, but not excessively, compensate plaintiffs for the past and future damages which they have sustained and probably will sustain. National Cab Co. v. Thompson, 208 Va. 731, 160 S.E.2d 769 (1968); Davenport v. Aldrich, 207 Va. 271, 148 S.E.2d 768 (1966); Smithey v. Sinclair Refining Co., 203 Va. 142, 122 S.E.2d 872, 875–876 (1961). Punitive damages are not to be awarded. 28 U.S.C. § 2674.

■ Kerri Lynn's father is, of course, entitled to recover for past and future medical expenses, including the expenses of any special therapy or special schooling, which may be required in the care and treatment of Kerri Lynn during her minority. Moses v. Akers, 203 Va. 130, 122 S.E.2d 864 (1961); Watson v. Daniel, 165 Va. 564, 183 S.E. 183, 187 (1936). So far as past medical expenses are concerned, these have been paid by the United States and therefore may not be included in the award. United States v. Brooks, 176 F.2d 482 (4th Cir. 1949). As for future medical expenses, the United States will continue to pay most of these so long as her father remains in the Navy, which he in all probability will until he is eligible for retirement after eight more years of service. Under CHAMPUS, plaintiffs may obtain free treatment and drugs at military medical facilities while the father continues on active duty. Where military facilities are not available, they may also use civilian medical facilities. In the latter event, they will be required to pay $1.75 a day or $25.00, whichever is greater, for all hospitalization

charges, including doctors and drugs. For out-patient care, they will be required to pay each year the first $50.00 and 20% of any amount exceeding the first $50.00. Additionally, if Kerri Lynn requires special schooling, plaintiffs will be required to pay the first $25.00 per month, the government will pay the next $350.00 per month, and plaintiffs will have to pay any additional monthly charge. In the event Kerri Lynn's father retires or dies, either before or after retirement, the government will pay 75% of all charges for her in-patient care and 75% of all charges for her out-patient care after a $50.00 deductible. The allowance for special schooling, however, is limited to the dependents of active duty personnel.

With respect to future medical expenses, it seems clear that, at a minimum, Kerri Lynn will require anti-convulsive medication [6] and a doctor's care for treatment of her seizure disorder for several more years. While the government will absorb the major portion of such expenses, her father will be required to absorb the first $50.00 plus 20% of the annual charges above $50.00 so long as she is treated on an out-patient basis at civilian facilities. Additionally, it is evident that both Kerri Lynn and her parents will require intensive psychotherapeutic help for at least several years if the child is to overcome her adjustment problems. It is also probable that she will need special schooling for the next few years. If, as the Clinic doctors recommend, a course of psychotherapy is undertaken, involving as many as three weekly visits at a cost of up to $30.00–$40.00 per hour, the

present one, because it faces the court with the difficult and uncertain task of prophecy, with no chance for second guessing. Schreiber, Damages in Personal Injury and Wrongful Death Cases (Practicing Law Institute, 1965) at page 21. It is evident that more just compensation would be achieved if the single-recovery rule were discarded and the court were permitted to retain jurisdiction to provide for periodic payments of

future damages as they are incurred. See Frankel v. United States, supra. The Government has rejected as impractical the Court's suggestion that some such resolution might be appropriate in the present case.

6. The cost of the anti-convulsant medication currently being taken by Kerri Lynn is approximately $100 per year.

annual cost will approximate $5,000 to $6,000 per year, of which plaintiffs will be required to pay something in excess of $1,000. If special schooling is required, at a minimal annual cost of $8,500, the government will pay about $4,200, and plaintiffs will be required to absorb the balance. Under all the circumstances disclosed by this record, including the uncertain future which lies ahead of Kerri Lynn and her parents, it is the considered judgment of this Court that the sum of $25,000 constitutes a fair, just and adequate award to plaintiff Thomas Elliott, Jr. to insure adequate future medical care, including such psychotherapy and special schooling as may be required, for the care and treatment of his daughter.

■ The damages properly to be awarded to Kerri Lynn are those which will compensate her for any future medical expenses which she may incur after she reaches her majority, which will reimburse her for any loss of earning capacity, and which will cover her past, present and future physical and mental pain and suffering. Hailes v. Gonzales, *supra*; Virginia Ry. Co. v. Farr, 147 Va. 217, 136 S.E. 668, 673 (1927). With respect to future medical expenses and loss of earning capacity, the evidence provides no proper basis for an award, which cannot be based upon speculation or conjecture. Smith v. Wright, *supra*; Hailes v. Gonzales, *supra*; Barnes v. Graham Virginia Quarries, Inc., *supra*. In calculating damages for pain and suffering, however, consideration must be given to the physical and mental pain and suffering, including the loss of enjoyment of life's pleasures, which Kerri Lynn has undergone and undoubtedly will undergo in the future as a result of her seizure disorder and emotional problems. A once normal, healthy, happy baby is now an emotionally disturbed, unhappy, discontented, frustrated, angry child. She is subject to convulsive seizures and each day must take anti-convulsive medication for the control of her seizure disorder. She feels rejected by her friends and unloved by her parents. She cannot enjoy the normal activities of a child her age. She regards herself as a damaged child. There is no doubt that she has suffered much in the past, and will continue to suffer much in the future, from her feelings of hurt, neglect and abandonment. An award of $85,000 will be made to Kerri Lynn for her physical and mental pain and suffering, past, present and future.

To summarize, the damages to be awarded plaintiffs for the injuries suffered by Kerri Lynn as the result of her negligent care, diagnosis and treatment by United States Navy medical personnel in June and July, 1966 are in the total amount of $110,000 as follows:

| | |
|---|---|
| To Thomas Elliott, Jr., her father, for medical and other expenses during Kerri Lynn's minority | $ 25,000 |
| To Kerri Lynn Elliott, by her father and next friend, Thomas Elliott, Jr., for pain and suffering, past, present, and future | 85,000 |
| Total — | $110,000. |

Judgment will be entered for plaintiffs in accordance herewith.