PRESENT: Carrico, C.J., Compton, Hassell, Keenan, Koontz, and
         Kinser, JJ., and Poff, Senior Justice

JOAN IRVINE SMITH

                                          OPINION BY
v.   Record No. 980250          SENIOR JUSTICE RICHARD H. POFF
                                       November 6, 1998
FLOYD R. LITTEN

              FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                   Carleton Penn, Judge Designate

     As defined by the employer named in an employee's suit

claiming damages for employment termination based upon age

discrimination, the issue on appeal is whether the trial court

"erred in allowing the stipulation into evidence of the

defendant's net worth of $50,000,000.00 when there was no

evidence of willful or wanton conduct or a conscious disregard

of the plaintiff's rights".  The underlying question is whether

the evidence was sufficient to support the trial court's ruling

authorizing the jury to consider an award of punitive damages.

     Floyd R. Litten (Litten) filed a motion for judgment

against Joan Irvine Smith (Ms. Smith) alleging, inter alia, that

he had been "terminated due to his age"; that this constituted a

"wrongful termination of employment in violation of the public

policy of the Commonwealth of Virginia against discrimination in

employment"; that the "unlawful termination . . . was wilful

and wanton, and evinced conscious disregard for the rights of

Litten"; and that he was entitled to both compensatory and

punitive damages.

The record shows that, in 1972, Ms. Smith employed Litten as caretaker of a large estate in Fauquier County that she had inherited. She and her husband, Morton Smith (Mr. Smith), lived in the manor house and allowed Litten, his wife, and his son to occupy another house on the property. In 1976, Ms. Smith moved to California where she made her home, never returning to her Virginia estate. After the Smiths' divorce in 1976, Ms. Smith authorized Mr. Smith to operate the horse farm on her Virginia estate.

In 1994, James Rich, an adjoining neighbor of the Smith estate for 20 years, telephoned Mr. Smith and inquired about a rumor he had heard that Ms. Smith had fired Litten. Mr. Smith confirmed the rumor and explained that Litten, who was 79 years of age, was "just too old and he hasn't done much around the farm for several years." Rich said that Mr. Smith "kind of runs the show over there . . . with [Mrs.] Ann Bland."

Mrs. Bland testified that Ms. Smith considered her "the overseer or the caretaker or just the farm manager." In a deposition conducted in California and admitted into evidence, Ms. Smith agreed that "both Mrs. Bland and Mr. Smith were [her] representatives in dealing with Mr. Litten" and that both had told her that Litten had stopped working the hours required of him. Other neighbors disagreed. Rich testified that the Smith property was "[v]ery well maintained" by Litten, because "he saw

to the details."  Another neighbor, William Leach, agreed that he "never saw any evidence of neglect" and that he wished his own property "looked as well."

Litten testified that neither Mrs. Bland nor Mr. Smith ever told him that he was not doing his work satisfactorily.  Litten explained that sometimes he would not work Saturdays because of the overtime he had worked during the week.  He also stated that, during hot weather, he would take longer lunch periods and make up the time in the cooler evenings.  Litten said that, when he asked Ms. Smith if he could plant his garden on her property, she said, "I don't give a damn if you put the whole front yard in a garden."  Litten admitted sharing the produce from his garden with neighbors and friends, and selling some at the market, but he claimed that he could do so because it "was my produce."

In her deposition, Ms. Smith said that she had made the decision to fire Litten "just prior to July of '94" and had instructed Mrs. Bland "to terminate him and . . . to call [her attorney] and have Mr. Litten given notice."

Litten first learned of his discharge when Mrs. Bland approached him at work.  Litten testified that she "come [sic] over and stopped" him and told him "you've got to get out, Mrs. Smith's got somebody to replace you."  Litten said that, in

reply to his question concerning his garden, Mrs. Bland said, "no, no garden . . . be out in 30 days."

In a letter addressed to Litten dated July 1, 1994, Ms. Smith's attorney informed him that he was "terminated from [his] employment with Mrs. Smith effective July 1, 1994", that he was "expected to vacate the house . . . by August 1, 1994", and that "the keys, tools, and any other miscellaneous items that belong to Mrs. Smith, should be turned in by July 15, 1994."

The attorney's letter did not state any reason for Litten's termination, and Ms. Smith never gave him one. In her deposition, Ms. Smith explained that her representatives, Mrs. Bland and Mr. Smith, had told her that Litten was using her pickup truck to transport garden produce, wild walnuts grown on her property, and firewood cut there for sale to local merchants.

At the conclusion of Litten's evidence, Ms. Smith moved to strike Litten's claim of punitive damages and objected to the introduction of a stipulation reached by counsel that Ms. Smith's net worth was approximately $50,000,000. The objection was based upon the ground that "there is no factual evidence as to malice, ill will or spite or conscious disregard of Mr. Litten's rights." The trial court overruled the objection, and the stipulation was read before the jury.

4

The court instructed the jury on punitive damages as follows:

> If you find that Mr. Litten is entitled to be compensated for his damages and you further believe by the greater weight of the evidence that [Ms.] Smith or Ann Bland acted under circumstances amounting to a willful and wanton disregard of Mr. Litten's rights, then you may also award punitive damages to punish [Ms. Smith] and to serve as an example to prevent others from acting in a similar way.

> Willful and wanton conduct is acting consciously in disregard of another person's rights or acting with a reckless indifference to the consequences to another person while aware of one's conduct and while also aware, from one's knowledge of existing circumstances and conditions, that one's conduct would probably result in injury to another.

The jury retired and, upon consideration of the evidence and the court's instructions, returned a verdict awarding Litten $36,000 in compensatory damages and $50,000 in punitive damages.

Initially, we note that the 1995 amendments to the Virginia Human Rights Act, Code § 2.1-725, place certain limits upon an employee's right to punitive damages for wrongful termination of employment. Because Litten was terminated and filed this motion for judgment before those amendments became effective, his cause of action is governed by the common law of Virginia.

In Shaw v. Titan Corporation, 255 Va. 535, 498 S.E.2d 696 (1998), we considered an appeal of a wrongful termination action filed before the 1995 amendments to the Virginia Human Rights Act took effect. There, we recognized wrongful termination as

5

an "intentional tort" and ruled that, "[w]hen a plaintiff pleads and proves an intentional tort under the common law of Virginia, the trier of fact may award punitive damages."  Id. at 545, 498 S.E.2d at 701.

On brief, Ms. Smith acknowledges that "a review of the key pieces of evidence that focus on the termination may establish a discriminatory discharge claim".  She argues, however, that the evidence is "free from any singular aggravating act on behalf of the Employer . . . that justifies admission of the Employer's net worth for consideration by the jury."  We disagree.

Under the well-established standard of appellate review, a trial court's judgment is presumed to be correct and, on appeal, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the prevailing party at trial.  Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992).  Additionally, as the party who comes before us with a jury verdict approved by the trial court, Litten "occupies the most favored position known to the law."  Id. (quoting Pugsley v. Privette, 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980)); accord Evaluation Research Corp. v. Alequin, 247 Va. 143, 147, 439 S.E.2d 387, 390 (1994).

The Virginia Human Rights Act declares that "[i]t is the policy of the Commonwealth of Virginia . . . [t]o safeguard all individuals within the Commonwealth from unlawful discrimination

6

because of . . . age . . . in employment". Code § 2.1-715. By its finding in favor of Litten, the jury necessarily concluded that Ms. Smith had violated that provision of the Act and that she had unlawfully discriminated against Litten by discharging him because, as her acknowledged representative reported, he had become "just too old". The court confirmed the jury's verdict, and Ms. Smith assigned no error to that ruling.

In considering whether the court properly admitted the stipulation as to Ms. Smith's net worth, we must decide whether there was sufficient evidence to submit the issue of punitive damages to the jury. In Hamilton Development Co. v. Broad Rock Club, 248 Va. 40, 45, 445 S.E.2d 140, 143 (1994), we said that the purpose of an award of punitive damages "is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others". We hold that the stipulation of the wrongdoer's net worth was material to that twofold purpose and relevant to a determination of the quantum of the award.

Punitive damages "may be recovered 'only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.'" Id. (quoting Giant of Virginia, Inc. v. Pigg, 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967)). However, the conclusion that there was misconduct or malice, or that a party acted with a conscious disregard of another's rights need only be a "possible

7

conclusion" the jury could reach.  Jordan v. Sauve and Koons, 219 Va. 448, 454, 247 S.E.2d 739, 742 (1978).

In Jordan, the plaintiff sued a car dealer for fraud in connection with her purchase of an automobile, seeking both compensatory and punitive damages.  At the conclusion of the plaintiff's evidence, the trial court struck the claim for punitive damages.  Reversing that ruling, we remanded the case, reasoning that:

> Considered in a light most favorable to plaintiff, the evidence of Sauve's misrepresentation that the car was new, coupled with his misstatements about the accumulated mileage, price sticker, brakes, sticker price and discount, and financing, would have justified the jury in finding Sauve's misconduct to be of such a reckless and negligent character as to evince a conscious disregard of Jordan's rights.  Though not inevitable, this was a possible conclusion, making the punitive damage issue one for the jury to decide on proper instructions.  Id.

Applying the rationale from Jordan to the facts of this case, we cannot say that the jury was unjustified in concluding that Ms. Smith acted with a conscious disregard of Litten's common law rights.

A summary of our opinions shows that if a tortfeasor's tort was intentional rather than negligent, i.e., deliberately committed with intent to harm the victim; or, if a tortfeasor's negligent act or omission in violation of the common law reflects malice, willful or wanton conduct, or a conscious disregard of the victim's common law rights; and if the evidence

8

is sufficient to support an award of compensatory damages, the victim's right to punitive damages and the quantum thereof are jury questions.

The trial court's instructions to the jury constituted a fair summary of these principles. The jury found the evidence sufficient to support an award of damages compensating Litten for the losses he sustained and an award of damages punishing Ms. Smith for committing a common law wrong. Finding no merit in Ms. Smith's assignment of error, we will affirm the judgment of the trial court.

Affirmed.