# CIRCUIT COURT OF THE CITY OF ROANOKE

Virginia Crouse

v.

Medical Facilities
of America XLVIII,
t/a Stanleytown
Healthcare Center, et al.

January 22, 2013

Case No. CL 09002319-00

By JUDGE CHARLES N. DORSEY

The parties are before the Court on Defendants' Post-Trial Motions. Defendants Medical Facilities of America XLVIII, t/a Stanleytown Healthcare Center, Medical Facilities of America, Inc. ("MFA, Inc."), Medical Facilities of Virginia Limited Partnership II, and Medical Facilities

of Virginia Limited Partnership III (collectively "Defendants") have moved the Court to (1) order a new trial on all issues or a new trial on compensatory damages or a remittitur of the compensatory damages and (2) set aside and grant judgment notwithstanding the verdict on the issue of punitive damages or, in the alternative, order a remittitur of the punitive damages.

Following the hearing in this matter and having considered the evidence, pleadings, and persuasive arguments made by counsel, the Court is prepared to rule. For the reasons stated below, both the compensatory and the punitive damages awards are upheld with appropriate reductions to comply with statutory limits on medical malpractice and punitive damages.

## I. *Compensatory Damages*

The jury awarded Plaintiff $1.5 million in compensatory damages. The Court upholds the compensatory damages award.

### A. *The Verdict Is Supported by Evidence*

Defendants ask the Court to order a new trial or, in the alternative, remittitur. Defendants argue that the compensatory damages award was excessive because this was "an unremarkable negligence action," Plaintiff never testified, and the evidence was insufficient to support the award. Defs.' Mem. P. & A. at 2. Defendants invoke the "average verdict rule" by comparing Plaintiff's injuries and resulting jury verdict to three prior personal injury cases in Virginia: *Rutherford v. Zearfoss*, 221 Va. 685, 272 S.E.2d 225 (1980) (upholding the trial court's order of a new trial in a malpractice case involving a doctor who delivered a baby negligently, resulting in cerebral palsy); *Fowlkes v. Tower Associates*, 37 Va. Cir. 389 (Norfolk 1995) (upholding a verdict of $1.5 million in compensatory damages awarded to a plaintiff who, due to a fall, could not work, experienced eight painful operations, and was permanently disfigured); and *Bassett Furniture Industries, Inc. v. McReynolds*, 216 Va. 897, 224 S.E.2d 323 (1976). In *Bassett*, the jury awarded $1,000,000 to a plaintiff who was paralyzed and sought compensation for medical expenses, lost wages, and a greatly diminished quality of life; however, the judge ordered the plaintiff to accept $550,000 or submit to a new trial. The Supreme Court of Virginia affirmed the judgment. However, the Supreme Court of Virginia no longer adheres to the average verdict rule. *See Lester v. Allied Concrete Co.*, 285 Va. 295. 312 (2013) ("Although a trial court may grant remittitur on the grounds that the award is disproportionate to the injuries suffered, we have specifically rejected comparing damage awards as a means of measuring excessiveness.") (internal citation omitted), 285 Va. at 316, n. 3 (McClanahan, J., concurring in part and dissenting in part) ("[W]e have rejected comparing statewide or nationwide jury verdicts to reach an 'average verdict'. . . ."); *John Crane, Inc. v. Jones*, 274 Va. 581, 594, 650

S.E.2d 851, 857-58 (2007) ("[T]his Court has routinely rejected the use of an 'average verdict rule' in determining whether a verdict is excessive. As early as 1925, in *Farris v. Norfolk & Western Ry.*, 141 Va. 622, 126 S.E. 673 (1925), we stated that the rule 'cannot be invoked where the injuries are internal, and have produced a condition of greatly impaired earning capacity, continuous pain and suffering, and a dislocated kidney that may or may not produce serious results'." (quoting *Farris*, 141 Va. at 626, 126 S.E. at 674)). The Court went on, "[s]ubsequent cases did not use an 'average verdict rule' where issues of pain and suffering were involved. Rather, this Court reviewed the facts and circumstances of each case to determine whether the verdict was excessive and the product of jury passion and prejudice or misapprehension of the case." *Id.*

The "math of the macabre" suggested by Defendants attempts to quantify Plaintiff's qualitative loss by reference to supposedly more gruesome cases. The Court's role in assessing jury verdicts does not submit to such distasteful precision. Based on the facts and circumstances of this case, the verdict is not excessive. The Court declines to order a new trial or remittitur.

In Virginia, the Court's authority regarding jury verdicts is limited. In *Bussey v. E.S.C. Restaurants, Inc.*, the Supreme Court of Virginia held that a trial court is authorized to set aside a jury verdict "only where it is plainly wrong or there is no credible evidence in the record to support that verdict." *Bussey v. E.S.C. Restaurants, Inc.*, 270 Va. 531, 538, 620 S.E.2d 764, 768 (2005). The Court went on to say:

> [t]rial court judges must accord the jury verdict the utmost deference. If there is a conflict in the testimony on a material point, or if reasonable people could differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given to the testimony, the trial court may not substitute its conclusion for that of the jury merely because the judge disagrees with the result.

*Id.* Quoting from the Constitution of Virginia, the Court stated, "trial by jury is preferable to any other, and ought to be held sacred." *Id.* (quoting Va. Const., art. I, § 11).

This is not to say that jury verdicts are unassailable. Trial courts have the authority to correct excessive verdicts when necessary. *See* Va. Code § 8.01-383 (providing that courts may set aside a jury verdict and order a new trial in any civil case); Va. Code § 8.01-383.1 (referencing the court's power to order a plaintiff to remit part of the recovery or else submit to a new trial). If a court determines that a verdict is "so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption, or prejudice or has misconceived or misunderstood the facts or the law," then it is incumbent on the judge to

correct the excessive verdict. *Smithey v. Sinclair Refining Co.*, 203 Va. 142, 146, 122 S.E.2d 872, 875-76 (1961). Similarly, a judge has a duty to reduce an award that "is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision." *Id.* However, there is no standard method for determining the value of a person's pain and suffering. *See Virginia Elec. & Power Co. v. Dungee*, 258 Va. 235, 263, 520 S.E.2d 164, 180 (1999); *Murphy v. Virginia Carolina Freight Lines, Inc.*, 215 Va. 770, 774-75, 213 S.E.2d 769, 772-73 (1975). The Court should not disturb the verdict unless it is so great as to indicate partiality or prejudice on the part of the jury. *Dungee*, 258 Va. at 263, 520 S.E.2d at 180. When addressing an excessive verdict, a trial court must consider the evidence in the light most favorable to the party that received the verdict. *Shepard v. Capital Foundry of Va., Inc.*, 262 Va. 715, 721, 554 S.E.2d 72, 75 (2001).

In the case at hand, viewing the evidence in the light most favorable to Plaintiff, neither a new trial nor remittitur is warranted.

The record is replete with evidence of Plaintiff's severe injuries and diminished quality of life. Plaintiff suffered a hip fracture, which required surgery, as well as a shoulder fracture. Tr. at 523:3-523:5. The left hip was broken in two different places, requiring a screw and plate to secure the fragments. Tr. at 524:15-524:21. Prior to the fall, Plaintiff was somewhat independent; after the fall, she needed assistance with almost all daily activities. Tr. at 549:24-550:3. For example, Plaintiff's left shoulder fracture prevented her from getting up or walking. Tr. at 305:6-305:9. She required a hospital bed and a mechanical lift at home. Tr. at 549:10-549:16. Both injuries required Plaintiff to take high doses of six types of narcotics to treat her pain. Tr. at 570:2-570:14. Plaintiff continued to complain regularly of pain in her injured leg and shoulder up to the time of the trial. Tr. at 553:6-553:12.

Defendants cannot establish that the verdict was plainly wrong or that there was no credible evidence to support the verdict. The evidence presented at trial as to Plaintiff's pain and injuries, including testimony from Plaintiff's treating physician, Dr. Mahoney, Tr. at 521:19-537:10, and Plaintiff's expert, Dr. McNamee, Tr. at 569:17-614:6, was sufficient to support the compensatory award. Defendants failed to designate a medical expert to challenge the doctors' testimony regarding Plaintiff's injuries at trial. The jury was entitled to believe the testimony of Plaintiff's experts and to award compensatory damages on that basis.

Defendants argue that the conflicting testimony on the issue of bed alarms and the size of the compensatory damages verdict lead to the inference that the jury punished Defendants based on improper consideration of their witnesses' veracity and demeanor. They cite *National Cab Co. v. Thompson* as support for this proposition. *National Cab Co. v. Thompson*, 208 Va. 731, 735-36, 160 S.E.2d 769, 772-73 (1968). In *National Cab*, a jury awarded $10,000 to a plaintiff who suffered a "mashed thumb" when exiting a

taxicab. *Id.* at 738, 160 S.E.2d at 774. The injury was "not disabling in any way" and "resulted in disability to a thumb, estimated to be 15%." *Id.* at 736-37, 160 S.E.2d at 773. The Supreme Court of Virginia concluded that the jury must have been influenced by improper factors, based on the size of the award (in 1968) relative to the injury, along with a remark by the trial judge implying that a defense witness's "manner, demeanor, attitude, or testimony" during trial may have warranted criminal prosecution. *Id.* at 735, 160 S.E.2d at 772. The trial judge remarked, "[a]s a matter of fact, I am not sure but what this is a case for the Commonwealth's Attorney's Office. . . ." *Id.* The Supreme Court appeared to accept "that, if there were something about the [witness], or his testimony or the incidents of the trial, as to have provoked this remark from the judge, then it is most likely that the same happenings undoubtedly influenced the jury, and motivated it in rendering the verdict it did." *Id.*

Defendants' attempt to analogize the present case to *National Cab* is unavailing. The compensatory damages are supported by the evidence of severe injury to Ms. Crouse, and the record does not disclose that the defense witnesses testified in a manner that would incite the jury to take their veracity or demeanor into account when determining the amount of damages to award. The Court is satisfied the jury did not use compensatory damages to punish Defendants for the veracity or demeanor of their witnesses.

The $1.5 million verdict was not so excessive as to "shock the conscience of the court," or to suggest that the jury acted other than in a fair and impartial manner. Plaintiff's injuries caused her a complete loss of function in all activities of daily living including ambulation, toileting, and dressing. Tr. at 575:25-576:10. The loss of the ability to perform these simple tasks caused Plaintiff to become completely dependent on others and diminished her quality of life. Tr. at 576:14-576:19. Based on the magnitude of Plaintiff's injuries and damages, the verdict does not shock the conscience of the Court or suggest that the jury was influenced by passion, corruption, or prejudice.

Accordingly, the Court declines to order a new trial or remittitur based on the size of the compensatory damages award.

## B. *Trial Tactics Were Appropriate*

Defendants argue that Plaintiff employed trial tactics that caused the jury to be motivated by passion, sympathy, and the desire to punish Defendants. The Court disagrees.

### 1. *The Testimony of Plaintiff's Nurse Expert Sue Robinson Was Proper*

Defendants take issue with Plaintiff's use of expert testimony given by Sue Robinson regarding the standard of care. Ms. Robinson testified that the applicable standard of care required a bed alarm in this case.

Defendants argue that Ms. Robinson's testimony was improper because (1) her testimony invaded the province of the jury by opining on whether there was a bed alarm and (2) she testified as to the veracity of defendants' witnesses.

Ms. Robinson's testimony regarding the non-use of a bed alarm was proper. Defendants argue that Ms. Robinson impermissibly gave her opinion as to the only factual issue the jury needed to determine: whether or not there was a bed alarm. The Supreme Court of Virginia has held that an expert's opinion is inadmissible if it relates to matters about which the jury is as capable as the expert of reaching an intelligent and informed opinion. *See David A. Parker Enters., Inc. v. Templeton*, 251 Va. 235, 237, 467 S.E.2d 488, 490 (1996). However, an expert's testimony *is* necessary to establish the appropriate standard of care, to establish a departure from the standard, and to establish that the departure was a proximate cause of the damages. *Perdieu v. Blackstone Family Practice Ctr.*, 264 Va. 408, 420, 568 S.E.2d 703, 710 (2002) (citing *Raines v. Lutz*, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986)).

In this case, Ms. Robinson testified that, based on her review of the records and evidence, the standard of care had been violated because Plaintiff had not been provided a bed alarm. Ms. Robinson stated her position on this key factual issue in order to explain how she arrived at her expert opinion that the standard of care was violated. Defendants' nurse expert, Janet Lawson, engaged in a parallel line of reasoning when she stated that a bed alarm *had* been used and, therefore, the standard of care *had* been met. Tr. at 752:2-752:7 ("And she had been provided with a bed pad alarm, which was a sensor pad so that when she moved about, they would hear it. . . ."). Each expert merely stated the basis of her opinion, which the jury was free to accept or to reject in whole or in part. Therefore, their testimony was proper.

Ms. Robinson's testimony regarding the veracity of Defendants' witnesses is not grounds for a new trial or remittitur. The Court is aware that "an expert witness may not express an opinion as to the veracity of a witness because such testimony improperly invades the province of the jury to determine the reliability of a witness." *Pritchett v. Commonwealth*, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002). However, when a defendant's lawyer opens the door to certain testimony, the defendant cannot later complain about that testimony. *See Lane v. Commonwealth*, 223 Va. 713, 718, 292 S.E.2d 358, 361 (1982); *Hundley v. Commonwealth*, 193 Va. 449, 454, 69 S.E.2d 336, 339 (1952) ("The answer of the witness was a natural one under the circumstances of the cross-examination to which he had been and was being subjected. If the answer constituted error it was invited error of which appellant cannot here complain."). Ms. Robinson did not testify as to the veracity of Defendants' witnesses until questioned on cross-examination. During her direct examination, Ms. Robinson stated that she

did not believe there was a bed alarm in place based on her review of the medical record, which did not contain any documented use of an alarm. Tr. at 452:9-456:11. At that point, defense counsel asked Ms. Robinson repeatedly whether she thought some witnesses were not credible. *See, e.g.,* Tr. at 481:12-481:14 ("Q: All right. So your opinion is based on you've just decided that some witnesses are not credible?"); Tr. at 486:13-486:14 ("Q: Okay. So we're back to credibility; you just don't believe it?"). Because Ms. Robinson's testimony on veracity was elicited by Defendant, the Court will not disturb the jury verdict on that ground.

The Court holds that Sue Robinson's testimony was proper and declines to order a new trial or remittitur on that basis.

## 2. *Defendants Cannot Now Object to Plaintiff's Closing Argument*

Defendants argue that Plaintiff's closing argument contained impermissible references to the parties' differing economic situations and asked for punitive action while still in the compensatory stage. Defendants point to several statements that, they contend, imply a great financial disparity between the parties: "these defendants had it within their power, had within their resources to meet Ms. Crouse's safety needs," Tr. at 866:8-866:10; "[w]hen you have the resources to train people, you have the resources to train them right," Tr. at 866:18-866:24; and "[t]o whom much is given, much is required. From those who have so little to give, much has been taken." Tr. at 866:25-867:2. Defendants also argue that Plaintiff's quoting of Proverbs, chapter 31, verses 8 and 9, Tr. at 867:8-867:12 ("Speak up for those who cannot speak for themselves, for the rights of all who are destitute, speak up judge fairly, defend the rights of the needy."), was inappropriate while still discussing compensatory damages, because the language urged the jury to act in a punitive spirit. Defendants assert that the financial references and use of the Bible passage, combined with the size of the award, support the inference that the jury acted with passion or prejudice when awarding compensatory damages.

Defendants' argument fails for two reasons. First, the Court instructed the jury not to guess or use passion when deciding the amount of compensatory damages. Tr. at 834:1-834:6. A jury is presumed to follow instructions, *see Centra Health, Inc. v. Mullins,* 277 Va. 59, 81, 670 S.E.2d 708, 720 (2009), and the above statements do not rebut the presumption. As previously noted, the compensatory damages award was supported by the evidence, and there is no indication that the jury based its award on the economic situations of the parties, rather than the evidence. Second, Defendants failed to make a contemporaneous objection to any of the statements made during Plaintiff's closing argument. "[O]bjection to improper argument before a jury should be made at the time of such argument." *See Cooke v. Griggs, Adm'x,* 183 Va. 851, 858, 33 S.E.2d 764, 766 (1945). "Except under unusual circumstances, objection to improper argument must be timely so that the trial court may

rule effectively, and, if not made until after the case has been submitted to the jury, it is too late." *Reid v. Baumgardner*, 217 Va. 769, 773, 232 S.E.2d 778, 781 (1977) (citing *Burks v. Webb, Adm'x*, 199 Va. 296, 311, 99 S.E.2d 629, 641 (1957)). Defendants do not point to any unusual circumstances that would justify making an exception to the rule in this case. The failure to raise any objection at the time of Plaintiff's closing argument constituted a waiver. *See Russo v. Commonwealth*, 207 Va. 251, 257, 148 S.E.2d 820, 825 (1966).

Therefore, the Court holds that Plaintiff's closing argument, combined with the size of the verdict, is not grounds for a new trial or remittitur.

### 3. Pendleton Smith's Testimony Was Proper

Defendants argue that Pendleton Smith's testimony was improper because it impeached Ms. Lawson on a collateral statement made during cross-examination. The Court finds that Ms. Lawson's statement was relevant, and Mr. Smith's testimony was proper.

In Virginia, "[a] witness may be impeached by showing that he has formerly made statements inconsistent with his present testimony." *Edwards v. Commonwealth*, 19 Va. App. 568, 571, 454 S.E.2d 1, 2 (1995) (quoting 1 Charles E. Friend, *The Law of Evidence in Virginia*, § 4-3(a), at 119 (4th ed. 1993)); *see Hall v. Commonwealth*, 233 Va. 369, 374, 355 S.E.2d 591, 594 (1987); *Neblett, Adm'r v. Hunter*, 207 Va. 335, 340, 150 S.E.2d 115, 119 (1966). "However, if the subject matter is raised for the first time on cross-examination and is collateral to the issues on trial, it cannot be the basis for impeachment by proof of a prior inconsistent statement." *Waller v. Commonwealth*, 22 Va. App. 53, 57, 467 S.E.2d 844, 847 (1996). "No question respecting any fact irrelevant to the issue can be put to a witness on cross-examination for the mere purpose of impeaching his credit by contradicting him." *Seilheimer v. Melville*, 224 Va. 323, 326-27, 295 S.E.2d 896, 898 (1982) (quoting *Allen v. Commonwealth*, 122 Va. 834, 842, 94 S.E. 783, 785-86 (1918)). It is well settled that:

> [t]he test as to whether a matter is material or collateral, in the matter of impeachment of a witness, is whether or not the cross-examining party would be entitled to prove it in support of his case.

> A fact is wholly collateral to the main issue if the fact cannot be used in evidence for any purpose other than for contradiction. "Evidence of collateral facts, *from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation*, is properly excluded for the reason that such evidence tends to draw the minds of the jury away from the point in issue, to excite prejudice, and mislead

them." Conversely, if the evidence tends, even slightly, to throw light upon the main fact in issue, it is not collateral, but probative. Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible. As Professor Friend points out, the "collateral facts" rule is purely a question of relevancy.

*Seilheimer*, 224 Va. at 327, 295 S.E.2d at 898 (emphasis added; citations omitted).

Defendants called Janet Lawson as their nurse expert witness. During the cross-examination of Ms. Lawson, Plaintiff asked her if she "ever told anybody that there is no excuse for the failure to provide a bed alarm to a patient in bed who needs one." Tr. at 760:5-769:8. Ms. Lawson initially answered that she could not "recall," Tr. at 760:15, and later testified that "those things were not said," Tr. at 761:8-761:12, to Mr. Smith. Plaintiff called Mr. Smith as a rebuttal witness. Mr. Smith testified that his father fell and remained on the ground for six hours while at a nursing home, and Ms. Lawson subsequently told him that there was "no excuse" for his father not having a bed alarm. Tr. at 812:10-813:5.

Defendants argue that Ms. Lawson's answer went to a collateral matter raised for the first time during cross-examination and that Plaintiffs sole purpose when asking Ms. Lawson about her statement was to impeach her with a later witness. A review of the record demonstrates that Ms. Lawson's testimony was relevant and Mr. Smith's testimony was proper.

Plaintiff's purpose when asking about the "no excuse" statement was to help establish the standard of care for nursing homes in regard to bed alarms. This intent is evidenced by the fact that, immediately prior to asking about the statement, Plaintiff asked Ms. Lawson if she was a nurse expert on bed alarms "talking about the standard of care for bed alarms." Tr. at 759:24-759:25, 760:2-760:3. Ms. Lawson was testifying as an expert regarding her experience with bed alarms, and her answer regarding whether she ever said that there is "no excuse for the failure to provide a bed alarm to a patient in bed who needs one" goes directly to the issue of the appropriate standard of care for bed alarm use in nursing homes. As such, her answer is relevant evidence that tends to "throw light" on the central issue of the applicable standard of care. Because Ms. Lawson's answer is relevant, the Court finds that Mr. Smith's testimony properly impeached Ms. Lawson by showing that she formerly made an inconsistent statement. *Seilheimer v. Melville*, 224 Va. 323, 327, 295 S.E.2d 896, 898 (1982) (citing *Stamper v. Commonwealth*, 220 Va. 260, 269, 257 S.E.2d 808, 815 (1979)).

Defendants argue that, although Pendleton Smith did not need to be disclosed as a witness prior to trial, Plaintiff compounded the problem of Mr. Smith's improper testimony by not disclosing him. The law is well settled that a rebuttal witness does not need to be disclosed prior to trial.

*See Breeden v. Roberts*, 258 Va. 411, 416, 518 S.E.2d 834, 837 (1999). Plaintiff's decision not to disclose Mr. Smith as a witness prior to trial was proper and has no bearing on the legitimacy of his testimony.

Furthermore, Pendleton Smith's testimony, when viewed in light of all the evidence presented in this case, had such a slight impact that any error regarding his testimony would be harmless.

In Virginia, an error is harmless "when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." *Schwartz v. Schwartz*, 46 Va. App. 145, 159, 616 S.E.2d 59, 66 (2005) (quoting Va. Code § 8.01-678).

> If, when all is said and done, [it is clear] that the error did not influence the [factfinder], or had but slight effect . . . the judgment should stand. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the [judgment] cannot stand.

*Schwartz*, 46 Va. App. at 159, 616 S.E.2d at 66 (quoting *Clay v. Commonwealth*, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)).

Mr. Smith's testimony had but slight effect upon the jury. Prior to Mr. Smith's testimony, the Court issued a cautionary instruction to the jury that Mr. Smith's testimony was only for the effect of weighing Ms. Lawson's credibility. The Court instructed the jury that "[Pendleton Smith's testimony] is not to be used or considered by you for any other purpose other than if you find it meaningful to aid in your job adjudicating the credibility of Ms. Lawson. It is not to be considered for any other purpose." Tr. at 810:17-810:22. If Mr. Smith's testimony is believed, it proves only that Ms. Lawson could not recall a statement she once made regarding the use of bed alarms. This evidence does little to damage Ms. Lawson's credibility. It does not contradict any of her previous testimony regarding a nursing home's standard of care, and, at most, it demonstrates that she cannot recall every statement she has made regarding bed alarms.

Defendants maintain that, during closing argument, Plaintiff's counsel encouraged the jury to disregard the Court's cautionary instruction that Mr. Smith's testimony was only to be considered for credibility. Defendants highlight Plaintiff's statement during closing that "defendants have turned to an expert whose conduct at her own facility has involved precisely the same safety violations, who has been a frequent employee of the defendants, hired to come into courtrooms just like this and testify." Tr. at 848:16-848:22. It is presumed "unless the record expressly shows otherwise, that

juries conscientiously follow an explicit cautionary instruction promptly given." *Hall v. Commonwealth*, 233 Va. 369, 375, 355 S.E.2d 591, 595, n. * (1987); *accord Centra Health, Inc. v. Mullins*, 277 Va. 59, 81, 670 S.E.2d 708, 720 (2009) ("A jury is presumed to follow the court's instructions. . . ."). The Court gave the jury an explicit cautionary instruction immediately prior to Mr. Smith's testimony. Plaintiff's closing argument falls short of rebutting the presumption that the jury followed the instruction. Thus, Mr. Smith's testimony had no impact on the jury beyond its effect on Ms. Lawson's credibility. This impact was so slight that any error regarding Mr. Smith's testimony was harmless. The Court is satisfied that the parties had a fair trial on the merits and substantial justice was reached.

## II. *Punitive Damages*

Defendants have asked the Court to set aside the entire $5 million punitive damages award. Otherwise, the parties have agreed that the limitations on damages set forth in Virginia Code § 8.01-581.15 and § 8.01-38.1 apply. In this case, Plaintiffs injury occurred on February 7, 2009. Because the "act or acts of malpractice" occurred between July 1, 2008, and June 30, 2012, Va. Code § 8.01-581.15 limits the total recovery to $2 million, inclusive of compensatory and punitive damages. *See Bulala v. Boyd*, 239 Va. 218, 230-31, 389 S.E.2d 670, 676 (1990) (holding that punitive damages could not be awarded where compensatory damages already exceeded the statutory cap). In addition, Va. Code § 8.01-38.1 limits punitive damages to a maximum award of $350,000. Defendants assert that punitive damages should be set aside because: (1) judicial notice of survey results was improper; (2) ratification of employee conduct was not present; and (3) Defendants exercised some care of Plaintiff. The Court upholds punitive damages.

## A. *Judicial Notice of Survey Results Was Proper*

Nursing homes across the United States are subject to periodic inspections for the purpose of verifying that they are in "substantial compliance" with requirements for participation in Medicare and Medicaid, as required by federal law. *See* 42 U.S.C. § 1395i-3 (2012); 42 C.F.R. §§ 488.300 through 488.335 (2012). In Virginia, these "surveys" are carried out by the Virginia Department of Health (VDH). One of the requirements of participation in the Medicare/Medicaid programs is that nursing homes make survey results and plans of correction "available for examination in a place readily accessible to residents." 42 C.F.R. § 483.10(g)(1) (2012). Facilities must further post a notice that survey results are available. *Id*. In practice, survey results are public documents; there is a copy at the front desk of every nursing home, Tr. at 905:14-905:23, and a full report of the latest standard health inspection for any given facility may be found on the official United States government website for Medicare. From http://www.medicare.

gov, follow the "Find nursing homes" hyperlink, enter a location, follow the link to a particular facility, and click the tab entitled "Inspections and complaints." The latest "Statement of Deficiencies and Plan of Correction" is accessible by clicking "View full report."

At trial, the Court took judicial notice of certain portions of survey results from several MFA-affiliated nursing homes in Virginia. Defendants argue that it was error for the Court to do so and that the survey results were inadmissible hearsay. The Court finds that taking judicial notice of the survey results was proper and, therefore, testimony regarding their contents was not barred by the rule against hearsay.

Far from being "irrelevant hearsay," Defs.' Reply Mem. at 8, the survey results were probative of whether Defendants had notice and actual knowledge of similar incidents of inadequate bed alarm use at other facilities. Tr. at 890:4-890:13. The parties differ over the degree to which those incidents must have resembled the circumstances surrounding Ms. Crouse's fall in order to establish notice to Defendants. In the context of products liability, the Supreme Court of Virginia held that evidence of similar accidents or occurrences was admissible "to show that a defendant had notice and actual knowledge of a defective condition, provided that the prior accidents or occurrences happened under substantially the same circumstances and had been caused by the same or substantially similar defects and dangers as those in issue." *Jones v. Ford Motor Co.*, 263 Va. 237, 256, 559 S.E.2d 592, 602 (2002); *see also Funkhouser v. Ford Motor Co.*, 284 Va. 214, 224, 726 S.E.2d 302, 308 (2012); *Ford Motor Co. v. Phelps*, 239 Va. 272, 276-77, 389 S.E.2d 454, 457 (1990); *Spurlin v. Richardson*, 203 Va. 984, 989, 128 S.E.2d 273, 277 (1962); *Powhatan Lime Co. v. Whetzel's Adm'x*, 118 Va. 161, 171, 86 S.E. 898, 902 (1915). The Court emphasized that such evidence must sufficiently "identify specific occurrences" so that similarity may be assessed for notice purposes. *Jones*, 263 Va. at 256, 559 S.E.2d at 602 (citing *General Motors Corp. v. Lupica*, 237 Va. 516, 521, 379 S.E.2d 311, 314 (1989)).

Given that the "substantial similarity" standard has been applied principally in cases involving defective products, it is debatable whether the same standard applies to the non-use of a product that is not alleged to be defective. Assuming the "substantial similarity" standard applies, however, the Court finds that the incidents discussed at trial *were* sufficiently similar to Ms. Crouse's situation to provide notice to Defendants that bed alarms were not being properly implemented at other facilities. MFA, Inc.'s Vice President of Clinical Services gave testimony regarding several alleged deficiencies involving the non-use or improper use of bed alarms at various MFA facilities. Tr. at 930:14-941:25. The same witness testified that nursing home personnel would meet with state surveyors, take notes regarding the surveyors' findings, and share the information with other nursing homes. Tr. at 942:1-942:25. The jury could properly infer from this testimony that

Defendants had notice of inadequate bed alarm use in MFA facilities prior to Ms. Crouse's fall. Further, given that bed alarms were an "important part of safety and fall prevention," Tr. at 442:6-442:10, notice that bed alarms were not being used *also* put Defendants on notice that the defect could lead to falls like Ms. Crouse's.

Defendants insist that taking judicial notice of the survey results required a preliminary finding that the alleged deficiencies actually existed. The Court disagrees; the allegations themselves were sufficient to provide notice to Defendants, whether or not they were true. Additionally, the Court finds that taking judicial notice of the survey results did not violate the rule against hearsay, even if they were offered for their truth. In *Scafetta v. Arlington County*, the Virginia Court of Appeals held that taking judicial notice of the contents of a document cannot violate the rule against hearsay when the document itself is not admitted into evidence. *Scafetta v. Arlington Co.*, 13 Va. App. 646, 648, 414 S.E.2d 438, 439 (1992). The Court reasoned that because "[j]udicial notice permits a court to determine the existence of a fact without formal evidence," it is therefore unnecessary for a document stating that fact to meet the requirements for admissibility. *Id.* Likewise, in the present case, the Court took judicial notice of the *contents* of the survey results, but did not admit the documents themselves into evidence. Because the survey results were not *themselves* admitted into evidence, the rule against hearsay was not an obstacle to the jury's consideration of their contents.

The taking of judicial notice did not conclusively establish that the deficiencies reported in the survey results actually existed. Defendants had the right to dispute the veracity and probative value of the survey results at trial, *see* 7B Michie's Jurisprudence, *Civil Procedure*, § 86 (2011) ("That a matter is judicially noted means merely that it is taken as true without offering of evidence by the party who should ordinarily have done so, *but the opponent is not prevented from disputing the matter*, if he believes it is disputable.") (emphasis added), which they in fact did. Plaintiff called Cindy Barnett to testify regarding the contents of the survey results. Plaintiff's questions focused on incidents at other MFA facilities regarding the use of bed alarms. *See* Tr. at 930:14-941:25. Defendants' cross examination of Ms. Barnett elicited testimony that none of the reported incidents occurred at Stanleytown and that Ms. Barnett could not "link any of those incidents up with any type of training." Tr. at 951:7-954:17. Defendants cannot now complain about what the jury was not told, Defs.' Mem. P. & A., at 22, when they were free to inform the jury about such matters at trial.

The Court agrees with Defendants that the survey results are not a traditional example of information subject to judicial notice, since the deficiencies alleged were not matters of common knowledge. 1 Charles E. Friend, *The Law of Evidence in Virginia*, § 3-2 (7th ed. 2012) ("There are two broad bases of judicial notice. First of all, the courts may take judicial

notice of matters which are 'common knowledge,' or, as it is sometimes stated, are part of the 'general experience of society.' Secondly, the courts may take judicial notice of material which, though not a matter of 'common knowledge,' may be easily ascertained by reference to reliable sources.") (citations omitted). On the other hand, the allegations could be "easily ascertained by reference to reliable sources," *id.* i.e., the publicly available survey results. Moreover, judicial notice was not merely discretionary in this case, but required by statute.

Virginia Code § 8.01-388 provides that "[t]he court *shall* take judicial notice of the contents of all *official publications* of this Commonwealth and its political subdivisions and agencies *required to be published* pursuant to the laws thereof. . . ." Va. Code § 8.01-388 (2012) (emphasis added). The Court finds that the survey results were both "official publications" and "required to be published." Thus, the Court was required to take judicial notice of the contents of the survey results.

### 1. *"Official Publications"*

Nursing home survey results are unquestionably official, as they are prepared by state employees acting in their official capacity while executing government-mandated health inspections. They are described as "official" documents in both the regulation mandating the disclosure of survey results and in the Medicare State Operations Manual. 42 C.F.R. § 401.133(a) (2012) ("official survey reports"); Ctrs. for Medicare & Medicaid Servs., Medicare State Operations Manual ¶¶ 7212.1, 7900 (2010), *available at* http://www.cms.gov/Regulations-and-Guidance-Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS1201984.html (referring to "the official Form CMS-2567" and providing that "[t]he official 'Statement of Deficiencies and Plan of Correction,' Form CMS-2567" must be released to the public on request). The surveyors enter their findings on forms prepared by the Centers for Medicare and Medicaid Services ("CMS"), which may be found on the CMS website, even where an item was "certificated" rather than "published." *See* Tr. at 907:11-910:13. Defendants correctly note that the version of the regulation in effect at the time of the *Scafetta* trial *did* use the word "publish." *Scafetta*, 13 Va. App. at 648, 414 S.E.2d at 439. *See* 47 C.F.R. § 90.203(a)(1)(1991). For the purposes of the Court's present analysis, only the 1991 version of the regulation will be considered. However, this does not affect the Court's ultimate conclusion that VDH survey results are official publications required to be published by law, making them subject to judicial notice under Va. Code § 8.01-388. *See* Defs.' Mem. P. & A. at 21, n. 12. "Publish" is defined variously as "to declare publicly," "[to] make generally known," "to make public announcement of," and "to place before the public (as through a mass medium)." *Merriam-Webster's Third New International Dictionary* 1837 (1976). 42 C.F.R. § 488.325 (2012) for Medicare & Medicaid Servs., Statement of Deficiencies and Plan of

Correction, Form CMS-2567, *available at* http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS2567.pdf.

As previously noted, the results of each facility's most recent survey are also currently posted online by CMS, contrary to Defendants' assertions. *See* Defs.' Mem. P. & A. at 21-22, n. 12.

Government-produced forms have been treated as official publications in another context. When an individual is arrested and refuses a blood or breath test, the form on which the arresting officer notes the refusal is, by statute, an "official publication" subject to judicial notice. Va. Code § 18.2-268.3 (2012) ("The Office of the Executive Secretary of the Supreme Court shall make the form [for refusing a blood or breath test] available on the Internet *and the form shall be considered an official publication of the Commonwealth for the purposes of § 8.01-388.*") (Emphasis added.) While the statute does not specify whether this "official publication" includes the police officer's writing or the form alone, the only sensible interpretation is that both the form and its contents are an official publication, as it would be of little use for a court to take judicial notice of a form without also noticing the information it is designed to convey.

It is equally appropriate in this case to treat survey results as official publications. They represent the VDH's formal assessment of the quality of care at Medicare-supported facilities. The Court is therefore convinced that nursing home survey results entered on CMS-generated forms are official publications for the purposes of Va. Code § 8.01-388.

## 2. *"Required to be Published"*

In *Scafetta v. Arlington County,* the Court of Appeals held that Va. Code § 8.01-388 required a trial court to take judicial notice of a Federal Communications Commission ("FCC") publication listing approved types of radar devices. *Scafetta v. Arlington Co.,* 13 Va. App. 646, 648, 414 S.E.2d 438, 439 (1992). The case involved a defendant charged with speeding. At trial, the defendant sought to suppress all evidence of his speed on the ground that the radar device used was not of a type that the FCC accepted. He supported his motion with a copy of the FCC's public notice of approved devices. The trial court, however, refused to take judicial notice of the document.

The Court of Appeals held that it was error for the trial court not to take judicial notice of the publication because, pursuant to a federal regulation, "[t]he FCC [was] *required* to *publish* periodically a list of certain electronic equipment which ha[d] been accepted by the commission." *Id.* (emphasis added). At the time of the trial, the regulation stated as follows: "[t]he Commission periodically publishes a list of equipment entitled 'Radio Equipment List, Equipment Acceptable for Licensing.' Copies of this list are available for public reference at the Commission's offices in Washington, D.C., and at each of its field offices." 47 C.F.R. § 90.203(a)

(1) (1991). The Court interpreted the regulation as requiring publication of the FCC accepted device list, bringing it within the scope of documents subject to judicial notice by a trial court. *Scafetta,* 13 Va. App. at 648, 414 S.E.2d at 439.

Defendants argue that the Court improperly inferred, by looking at a newer version of the regulation at issue in *Scafetta,* that the requirements for judicial notice were met even where an item was "certificated" rather than "published." *See* Tr. at 907:11-910:13. Defendants correctly note that the version of the regulation in effect at the time of the *Scafetta* trial *did* use the word "publish." *See* 47 C.F.R. § 90.203(a)(1) (1991). For the purposes of the Court's present analysis, only the 1991 version of the regulation will be considered. However, this does not affect the Court's ultimate conclusion that VDH survey results are official publications required to be published by law, making them subject to judicial notice under Va. Code § 8.01-388.

When comparing the above regulation to the regulation requiring the disclosure of VDH survey results, it is notable that the latter regulation lacks the word "publish." Specifically, 42 C.F.R. § 488.325 states that the results of surveys "*must be made available* to the public, upon the public's request." 42 C.F.R. § 488.325(a) (2012) (emphasis added). Defendants make much of this distinction, arguing that documents that "must be made available to the public" are not actually "required to be published," and, therefore, are not subject to judicial notice. They highlight language in Va. Code § 8.01-385(6) providing that "[t]he term 'publish' includes posting by an agency or political subdivision on its official website," noting that the VDH did not post the survey results discussed in this case on its website. *See* Defs.' Mem. P. & A. at 21, n. 12.

Defendants' reasoning is unconvincing. The essence of publishing is the act of making information public, which 42 C.F.R. § 488.325 unambiguously requires. "Publish" is defined variously as "to declare publicly," "[to] make generally known," "to make public announcement of," and "to place before the public (as through a mass medium)." *Merriam-Webster's Third New International Dictionary* 1837 (1976). While the regulation does not use the word "publish," the requirement that documents "must be made available to the public," in conjunction with other language, produces an equivalent result. The section and paragraph containing the provision in question are entitled, respectively, "Disclosure of results of surveys and activities" and "Information which must be provided to public." 42 C.F.R. § 488.325 (2012). Further, 42 C.F.R. § 483.10(g)(1) requires that facilities "must make the results [of the latest survey] available for examination in a place readily accessible to residents and must post a notice of their availability." Information that "must be made available," "must be provided to [the] public," and is "disclos[ed]" can safely be considered public information, made public through the act of publishing. Though Virginia law provides

that the word "publish" *includes* posting items on an agency's website, it does not re-define the word to *require* Internet publication.

Based on the language of the relevant federal regulations and their practical implementation, the Court finds that VDH survey results are official publications required to be published within the meaning of Va. Code § 8.01-388. Therefore, the Court was required to take judicial notice of their contents.

**B. *The Evidence Supported a Finding That Defendants Participated in, Authorized, or Ratified the Conduct of Employees***

An employer is not liable for punitive damages based on the willful or wanton conduct of an employee "unless the employer authorized or subsequently ratified the conduct." *Timchak v. Ogden Allied Servs. Corp.*, 24 Va. Cir. 70, 72 (Loudoun Co. 1991). Defendants argue that there is no evidence Defendants authorized or ratified the conduct of the employees at Stanleytown and, therefore, the punitive damages award should be set aside. Defs.' Mem. P. & A. at 28-29.

Plaintiff maintains that punitive damages are appropriate because ratification was present, and, even in the absence of ratification, punitive damages are appropriate because Defendants authorized or participated in the misconduct. *See Freeman v. Sproles*, 204 Va. 353, 358, 131 S.E.2d 410, 414 (1963); *Hogg v. Plant*, 145 Va. 175, 181,133 S.E. 759, 761 (1926) ("It must be considered as the settled law of this State that punitive damages cannot be awarded against a master or principal for the wrongful act of his servant or agent in which he did not participate, and which he did not authorize or ratify."). The parties' agreed jury instructions, which represent the "law of the case," *SuperValu, Inc. v. Johnson*, 276 Va. 356, 367, 666 S.E.2d 335, 341 (2008), confirm that punitive damages are available against an employer for the actions of an employee if the employer "participated in, authorized, or ratified" that conduct. Punitive Jury Instruction 4.

The evidence presented at trial supports punitive damages. Viewing the evidence in the light most favorable to Plaintiff, *see Kamlar Corp. v. Haley*, 224 Va. 699, 704, 299 S.E.2d 514, 516 (1983) (reciting with approval a trial court's review of the evidence supporting a punitive damages award in the light most favorable to the plaintiff), Defendants participated in, authorized, or ratified the employees' conduct because their instructions and training materials improperly taught staff to view bed alarms as restraints, Tr. at 408:18-408:25, 409:6-409:25, and encouraged staff to use restraints less often. Tr. at 410:1-413:4, 437:13-437:22, 469:3-469:7 ("They went as far as not only saying not to use them, that it would be less time for the staff if they did not use them and set a tone to encourage staff not to use these devices."). The training materials were prepared, approved, and revised by the MFA home office years prior to the incident giving rise to this case, Tr. at 384:16-388:25, and were mandatory for all direct care staff, including

the staff at the Stanleytown nursing home. Tr. at 178:22-180:22. Furthermore, Defendants continued to rely on the training materials despite receiving notice from the VDH that bed alarms were not being used properly in other facilities. Tr. at 419:10-419:25. Defendants did not "retire," Tr. at 432:10, 433:11, their training materials until after Crouse's fall. The Court finds that there was sufficient evidence presented at trial for the jury to conclude that authorization, ratification, or participation in the neglect occurred. Thus, the Court will not disturb the punitive damages award.

## C. *The Exercise of "Some Care" Does Not Bar Punitive Damages*

Defendants argue that *Philip Morris, Inc. v. Emerson* establishes that a plaintiff cannot recover punitive damages where the defendant exercised *some* care, even if that care was insufficient. *See Philip Morris, Inc. v. Emerson*, 235 Va. 380, 408-09, 368 S.E.2d 268, 283-84 (1988). They claim that punitive damages are not available because they exercised "some care" when Ms. Crouse was assessed and care-planned for a bed alarm. Defs.' Mem. P. & A. at 29-31.

Plaintiff contends that *Philip Morris* did not hold that some care would always preclude punitive damages, but rather that enough care was exercised in that particular case. Plaintiff points to *Alfonso v. Robinson*, a more recent case, to assert that *some* care is not always *enough* care to avoid punitive damages. *See Alfonso v. Robinson*, 257 Va. 540, 545, 514 S.E.2d 615, 618 (1999).

In *Alfonso*, a truck driver parked his disabled truck in the road at night without activating the hazard lights or using flares or reflective triangles to alert other drivers. *Id.* at 542-44, 514 S.E.2d at 616-17. A wreck occurred and the truck driver was sued on the theories of both ordinary and willful and wanton negligence. *Id.* at 542, 514 S.E.2d at 616-17. At trial, the truck driver argued that the jury should not have been instructed on willful and wanton negligence because he attempted to remove the truck from the highway, tried to contact his employer, and ran to a nearby rest area to obtain assistance by telephone. *Id.* at 544, 514 S.E.2d at 618. Despite these actions, the Supreme Court of Virginia held that the trial court did not err in instructing the jury on willful and wanton negligence, noting that Alfonso was a professional driver who knew the importance of the safety precautions. *Id.* at 546, 514 S.E.2d at 619. The Court agrees with Plaintiff that if *Philip Morris* were controlling law, the driver's actions in *Alfonso* would have protected him from punitive damages.

In defining willful and wanton negligence, the Supreme Court of Virginia has consistently applied the standard discussed at length in *Booth v. Robertson. See, e.g., Green v. Ingram*, 269 Va. 281, 292, 608 S.E.2d 917, 923 (2005) (citing *Booth v. Robertson*, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1998)); *Etherton v. Doe*, 268 Va. 209, 213, 597 S.E.2d 87, 90 (2004); *Doe v. Isaacs*, 265 Va. 531, 535, 579 S.E.2d 174, 176 (2003). Under this

standard, punitive damages are proper in a personal injury action when there is "negligence which is so willful or wanton as to evince a conscious disregard of the rights of others." *Booth*, 236 Va. at 273, 374 S.E.2d at 3. Each case raising the issue of willful and wanton negligence must be evaluated on its own facts, *Woods v. Mendez*, 265 Va. 68, 76-77, 574 S.E.2d 263, 268 (2003) ("Each case raising an issue concerning the sufficiency of a claim of willful and wanton negligence must be evaluated on its own facts." (citing *Alfonso*, 257 Va. at 545, 514 S.E.2d at 618)), and the jury's "conclusion that there was misconduct or malice, or that a party acted with a conscious disregard of another's rights, need only be a possible conclusion the jury could reach." *Smith v. Litten*, 256 Va. 573, 578-79, 507 S.E.2d 77, 80 (1998) (citing *Jordan v. Sauve*, 219 Va. 448, 454, 247 S.E.2d 739, 742 (1978)). Given the evidence in this case, a reasonable jury could conclude the defendant acted with the degree of negligence necessary to support punitive damages. That Defendants may have exercised "some care" is insufficient to demonstrate their conduct did not rise to willful and wanton negligence. Accordingly, the Court is convinced that punitive damages are available to Plaintiff.

D. *Punitive Damages Do Not Require a "Duty To Supervise"*

Defendants assert that Virginia law does not recognize a tort of negligent training or negligent supervision. *See* Defendants' Memorandum of Points and Authorities at 31-32 (citing *Sippel v. MJS Corp.*, 70 Va. Cir. 436 (Alexandria 2003); *Gray v. Rhoads*, 55 Va. Cir. 362, 377 (Charlottesville 2001); *Williams v. Dowell*, 34 Va. Cir. 240, 243 (Richmond 1994); *Chesapeake & Potomac Tel. Co. v. Dowdy*, 235 Va. 55, 61, 365 S.E.2d 751, 754 (1988)). Thus, Defendants argue, a finding that they negligently supervised staff through defective training materials could not support a punitive damages award as a matter of law.

Virginia law remains unsettled on whether there is ever a common law duty to supervise. *Compare Elliott v. Cook*, 60 Va. Cir. 1, 3-4 (Loudoun Co. 2002) ("The standard of care applicable to a hospital may very well include the hiring, retention, and supervision of its employees.") *with Stottlemyer v. Ghramm*, 60 Va. Cir. 474, 484 (Winchester 2001), *aff'd*, 268 Va. 7, 597 S.E.2d 191 (2004) ("Under the weight of case authority, this Court cannot find a viable cause of action for a hospital's failure to 'supervise' a health care professional who is an independent contractor utilizing the hospital facilities."). This Court has so far declined to recognize such a duty, in light of the majority view that no tort of negligent supervision exists in Virginia. *Gilbertson v. Purdham*, 78 Va. Cir. 295 (Roanoke 2009) (sustaining a demurrer to the plaintiffs' negligent supervision claim, stating that, while a minority of courts have recognized such a duty, federal courts and most state courts have not). The Supreme Court has not squarely addressed whether a duty to supervise may be imposed on medical facilities. *Stottlemyer*,

268 Va. at 13-14, 597 S.E.2d at 194 ("We need not consider whether plaintiff had causes of action against Winchester Medical Center far [sic] negligent supervision or negligent credentialing because the jury found that Dr. Ghramm was not negligent and, therefore, those issues are moot.").

The Court need not revisit the question here. Defendants' entire argument on the lack of a duty to supervise presupposes that punitive damages may only be imposed on a theory of direct, rather than vicarious, liability. Because the Court has ruled against Defendants and upheld the jury verdict on the ground that Defendants participated in, authorized, or ratified the conduct of employees, the Court does not reach Defendants' final argument regarding the lack of a duty to supervise. The jury was thoroughly instructed on the theory of ratification and was entitled to find that ratification was present. *See* Punitive Jury Instructions 1, 4, 6.

## II. *Conclusion*

For the foregoing reasons, Defendants' Post-Trial Motions are denied. Defendants are jointly and severally liable for the compensatory damages award of $1.5 million. Pursuant to Va. Code § 8.01-38.1, Defendants are additionally liable for punitive damages of no more than $350,000 in proportion to the amounts awarded by the jury, i.e., two-fifths owed by MFA, Inc., and three-fifths owed by Stanleytown Healthcare Center, subject to interest calculations as explained below and further subject to the condition that total damages, including pre-judgment interest, do not exceed $2 million. If pre-judgment interest exceeds $150,000, punitive damages must be reduced accordingly.

The jury awarded Plaintiff interest on both the compensatory and punitive damages awards, accruing from February 7, 2009. Pursuant to Va. Code § 8.01-581.15, the "total amount recoverable" in this case is $2 million. The statutory cap includes any interest awarded prior to the date of the verdict, *Pulliam v. Coastal Emergency Servs., Inc.*, 257 Va. 1, 24-25, 509 S.E.2d 307, 320-21 (1999), based on the principle that "prejudgment interest is normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered." *Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 631, 449 S.E.2d 799, 801 (1994) (quoting *Monessen Southwestern Ry. v. Morgan*, 486 U.S. 330, 335, 108 S. Ct. 1837, 100 L. Ed. 2d 349 (1988)). Thus, Plaintiff is entitled to recover pre-judgment interest on the compensatory damages award to the extent the total award does not exceed $2 million. Compensatory damages must be satisfied before punitive damages. *See Bulala v. Boyd*, 239 Va. 218, 230-31, 389 S.E.2d 670 (1990) (holding that punitive damages were extinguished when compensatory damages exceeded the total amount recoverable under Va. Code § 8.01-581.15). The jury's award of pre-judgment interest on punitive damages must be extinguished because the *total* amount of punitive damages recoverable under Va. Code § 8.01-38.1 is $350,000. It is also questionable whether

pre-judgment interest may be awarded on punitive damages in the first place since the rationale for awarding such interest does not apply to punitive damages. *See LeBrun v. Yakeley*, 67 Va. Cir. 122, 123 (Fairfax Co. 2005) ("[Punitive damages] are intended to punish the defendant and to serve as an example to others from acting in a similar way. Thus, the purposes of pre-judgment interest, to make the plaintiff whole, and punitive damages, to punish the defendant and serve as a deterrent to others, are antithetical."); *Right to Prejudgment Interest on Punitive or Multiple Damages Awards*, 9 A.L.R.5th 63 (2012) (stating the majority view that pre-judgment interest may not be collected on punitive damages).

Although pre-judgment interest is limited by statutory caps, this Court is of the opinion that neither Va. Code § 8.01-581.15 nor Va. Code § 8.01-38.1 imposes a limit on interest accruing *after* the date of a verdict. "[P]ost-judgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due." *Dairyland*, 248 Va. at 632, 449 S.E.2d at 801 (1994) (quoting *Nationwide Mut. Ins. Co. v. Finley*, 215 Va. 700, 702, 214 S.E.2d 129, 131 (1975)). Va. Code § 8.01-382 requires that interest be paid at the judgment rate "from the date that the jury verdict was rendered." Va. Code § 6.2-302 (2012); Va. Code § 8.01-382 (2012). The Supreme Court of Virginia has interpreted the statute to mean that "post-judgment interest shall begin to accrue on the date that a fixed amount of a judgment debt is rendered by the factfinder charged with making that determination." *Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 275 Va. 41, 64, 655 S.E.2d 10, 23 (2008). The Court further explained:

> if in confirming the jury's award of damages a trial court properly reduces the award because of a statutory cap or to bring the award into conformance with the ad damnum of the complaint, post-judgment interest shall accrue only on the amount of the award to which the plaintiff is legally entitled. Nonetheless, the interest shall accrue on that amount from the date of the verdict, not the date of the trial court's order confirming the adjusted amount of the award.

*Id.* at 64, n. 9, 655 S.E.2d at 23, n. 9.

The amounts awarded to Plaintiff became "actually due" on the dates of the verdicts. Thus, Plaintiff is further entitled to the judgment rate of interest on compensatory damages from March 22, 2012, and on punitive damages from March 23, 2012. Post-judgment interest shall not accrue on any pre-judgment interest awarded. *See id.* at 67, 655 S.E.2d at 25.